JS 6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 1079 | **DATE** | 9/29/2000 |
| **CASE TITLE** | Henderson vs. Page | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the foregoing reasons, the court orders that a writ of habeas corpus will be granted unless the State of Illinois holds an appropriate new hearing on Petitioner's *Batson* claim within 120 days of the date of this order. If the *Batson* hearing is not held within that time limit, a writ of habeas corpus will be granted unless the Petitioner is retried within 240 days of the date of this order. This order will be automatically stayed during the pendency of any appeal.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 2 9 2000 | |
| ✓ | Docketing to mail notices. | date docketed | | 56 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TP | courtroom deputy's initials | FO-7 FILED FOR DOCKETING 00 SEP 29 PM 4: 29 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.  )
DEMETRIUS HENDERSON,  )
            )
          Petitioner,  )
            )    No. 97 C 1079
          v.  )
            )    HON. JOHN A. NORDBERG
THOMAS PAGE, Warden,  )
Menard Correctional Center,  )
          Respondent.  )

DOCKETED

SEP 2 9 2000

## MEMORANDUM OPINION AND ORDER

    Petitioner Demetrius Henderson ("Petitioner") was convicted for the sexual assault, kidnaping and murder of Kimberly Boyd and sentenced to death. After unsuccessfully challenging his conviction and sentence on direct appeal and in a state post-conviction proceeding, Petitioner filed a seven count federal habeas corpus petition alleging that constitutional error resulted in his conviction and sentence of death.

## BACKGROUND

    The basic facts were described by the Illinois Supreme Court as follows.

    The sexual assault, kidnaping, and murder of 16-year-old Kim Boyd took place during the early morning hours of July 13, 1986. On the night of July 12-13, there was a party at the house of codefendant Curtis Croft attended by defendant, Boyd, codefendants Croft, Kevin Campbell, and Alonzo Woodard, and others, including Anthony Woodard, who testified for the prosecution. There were various comings and goings during that night until around 3 a.m., when Boyd was alone in the house with defendant, Croft, Campbell, and Alonzo and Anthony Woodard. What happened next was revealed by the testimony of Anthony Woodard, by defendant's signed statement given to Assistant State's Attorney Bernard Murray and Chicago police detective Lee Almanza on July 18, 1986, and by the testimony of Dr. Mitre Kalekar, the deputy medical examiner who performed the autopsy on Boyd.

According to defendant's statement, he called Boyd and Anthony into a separate room and angrily asked Boyd why she was having sexual relations with both Anthony and Alonzo Woodard. Boyd made a "smart remark," so defendant picked up a roll of wallpaper and hit her in the head. Defendant then called Croft, Campbell, and Alonzo Woodard into the room, and defendant and those three forced Boyd to engage in a variety of sexual acts. After they were finished, defendant talked to Croft and Campbell about what to do with Boyd. Defendant said they could not just let Boyd go, even though she said she would not say anything, because if he were a girl he would tell what had happened. Instead, defendant said they would have to kill her because he was "not going to spend no time in jail for a bitch." Defendant then went outside to give a friend's car a jump. As he returned to the house, he saw Croft and Campbell indicating he should keep quiet and drive his car to the back of the house. When defendant did so, he saw Boyd standing blindfolded; Croft, Campbell, and Anthony and Alonzo Woodard were present. After Anthony began walking back toward the front of the house, Croft and Campbell put Boyd in the trunk of defendant's car. Campbell said that he, Anthony, and Alonzo would follow, in a second car, defendant's car containing defendant, Croft, and Boyd. Before driving away, defendant stopped and gave another jump to his friend's car. Defendant then intentionally evaded the following car, explaining that he did so because he did not want the others to be present when Curtis and he killed Boyd.

Anthony Woodard's testimony on behalf of the prosecution varied from defendant's statement primarily by denying that his brother Alonzo and Campbell voluntarily participated in the assault. Anthony testified that defendant and Boyd went into a separate room, that defendant then called him into the room, and that he and Croft joined defendant and Boyd. Defendant ordered Boyd to take off her pants, and when she began fighting back defendant hit her twice in the jaw. While Anthony sat in a chair, defendant and Croft forced Boyd to have sexual intercourse. Anthony told defendant and Croft to stop but did not try to physically stop them because Croft had a knife with a six-inch blade. Anthony could hear his brother Alonzo and Campbell trying to get into the room, but a chair in front of the door prevented them from entering. Later, defendant opened the door and told Alonzo and Campbell to have sex with Boyd; they did so while Croft held a knife on them. Anthony also said that defendant had a knife in his pocket. Defendant then took Boyd into the bathroom, and when they came out Boyd had cleanser on her face. Defendant and Croft tried to confuse Boyd by telling her she was somewhere else. Defendant then said they would have to kill Boyd. While Croft blindfolded Boyd and took her behind the house, defendant went to get his car. Anthony, Alonzo, and Campbell went to the front of the house where they had parked their car, and Anthony saw defendant giving a car a jump. Defendant then drove his car to the back of the house and in a few minutes drove back to the front of the house with Croft in the car. When Campbell asked where Boyd was, Croft patted the trunk of the car. Alonzo offered to take Boyd home, but Croft said he

and defendant would do that and tried to ignore the other three. Alonzo, Anthony, and Campbell tried to follow defendant's car in their own car. When they reached the street where defendant should have turned to take Boyd home, Alonzo, who was driving, blew his horn. But defendant continued on and Alonzo soon lost him in traffic.

Through cross-examination, defendant's attorney tried to discredit Anthony's credibility. Anthony testified that he would try to help out his brother and Campbell, who was like a cousin to him, but that he was not related to defendant or Croft. Anthony admitted that he had not tried to physically stop the assault, but had merely asked defendant and Croft to stop. Nor did he try to escape from the room and get help, even though at certain times, when Croft was with Boyd, he only would have had to get by defendant, whose knife was in his back pocket and who was smaller, although older, than Anthony. Furthermore, Anthony never approached the police to tell them what had happened, waiting until they came to him.

We have only defendant's statement, and the forensic evidence, to tell us what happened after defendant eluded the other car. Both defendant and Croft expressed some hesitancy about killing Boyd, but in the end decided that they had to do it. Defendant stopped the car in an alley behind the 6000 block of South Carpenter Street in Chicago, and opened the car's trunk, and he and Croft took Boyd out. She told defendant she could "explain," but defendant grabbed a switchblade knife Croft was holding and stabbed her twice in the throat. Croft then took the knife and stabbed Boyd, then defendant did so, and they alternated in this way until Boyd had approximately 40 stab wounds in her head, neck, chest, hands, back, and buttocks. Believing she was not yet dead, defendant and Croft got into the car and defendant drove over her three times. They got out of the car, confirmed that she was finally dead, and drove away. Dr. Kalekar testified concerning the multiple stab wounds, bruises, broken bones, and other wounds to the body consistent with being run over and dragged by a car.

Boyd's body was found later that morning and a police investigation was begun, leading to the arrest of defendant and Curtis Croft on July 17, 1986, at defendant's home. At the Area 3 Violent Crimes police station during the night of July 17-18, Assistant State's Attorney Murray and various detectives questioned defendant, Croft, Campbell, Anthony and Alonzo Woodard, and two girls who had attended the party the night of July 12-13. Initially, defendant denied involvement in the murder, although he admitted being at the party. When Assistant State's Attorney Murray told defendant this was inconsistent with what other witnesses had said, defendant asked what Croft had said. Croft was brought into the room and recounted the statement he had made to the police earlier. Defendant then made both an oral and a court-reported statement....

On August 6, 1986 Petitioner was indicted, along with several co-defendants, for the sexual assault, kidnaping, and murder of Kimberly Boyd. Prior to trial, Petitioner moved to quash his arrest, suppress his confession, and sever his

trial. The Court denied the motions to quash and suppress and granted the motion to sever, resulting in a simultaneous bench-jury trial. On May 12, 1987 a jury convicted Petitioner of aggravated kidnaping, aggravated criminal sexual assault, and murder. Having accepted a waiver of a capital jury sentencing, the trial judge conducted a sentencing hearing, where he determined that defendant was 18 years old at the time of the murder, that he had killed the victim during the course of the felony, and, therefore, that he was eligible for the death penalty. After hearing evidence in aggravation and mitigation, the judge also determined that there were no mitigating factors sufficient to preclude the imposition of the death penalty, and sentenced defendant to death, along with 45 years on the aggravated criminal sexual assault conviction and 10 years on the aggravated kidnaping conviction.

See *People v. Henderson*, 142 Ill.2d 258, 273-77, 568 N.E.2d 1234, 1242-44, 154 Ill. Dec. 785, 793-95 (1990), *cert. denied*, 502 U.S. 882 (1991).

On direct appeal to the Illinois Supreme Court, Henderson raised over 20 issues regarding his conviction and sentence. The Illinois Supreme Court ultimately affirmed Henderson's convictions and death sentence, but reduced the sentence for aggravated criminal sexual assault to 30 years. *People v. Henderson*, 142 Ill.2d 258, 568 N.E.2d 1234, 154 Ill. Dec. 785 (1990), *cert. denied*, 502 U.S. 882 (1991). On June 23, 1993, the Circuit Court of Cook County dismissed the Petitioner's post-conviction petition, which challenged both his conviction and sentence of death, without conducting an evidentiary hearing. The Illinois Supreme Court affirmed the dismissal on January 25, 1996. *People v. Henderson*, 171 Ill.2d 124, 662 N.E.2d 1287, 215 Ill. Dec. 147, *cert. denied*, 519 U.S. 953 (1996).

In his petition for habeas relief, Petitioner claims that: (1) the prosecution discriminated against blacks in using its peremptory challenges in violation of *Batson*; (2) defense counsel was ineffective in failing to present corroborating medical evidence evidence of physical coercion with the motion to suppress his confession; (3) he was denied a fair trial as a consequence of

4

cumulative trial errors including the submission of Petitioner's statement relating to an intent to commit another murder, the prosecutor eliciting testimony of a prior consistent statement by a state witness, the prosecutor making numerous improper statements in his closing intended to inflame juror emotions, and the prosecutor making an improper statement about the lack of fingerprint evidence; (4) he did not knowingly and intelligently waive the right to a sentencing jury because he was not informed that jury would decide both the eligibility and mitigation/aggravation phases of sentencing and that a sentencing jury must be unanimous to impose the death penalty ("one-juror rule"); (5) he was denied a fair death penalty hearing by the trial judge's refusal to consider mitigating evidence of his traumatic childhood and troubled family history; (6) defense counsel was ineffective in failing to investigate available mitigating and aggravating evidence prior to the innocence-guilt phase in order to ensure a cohesive strategy for the sentencing phase, request the appointment of a psychologist to do a full psychological evaluation and testify on Petitioner's behalf (instead of relying upon an unqualified social worker), and investigate and present substantial explanatory and humanizing mitigating evidence (including, but not limited to, evidence that at the time of the crime the Petitioner was under the influence of an extreme mental or emotional disturbance); and (7) he was denied due process by the trial court's use of the rehabilitation standard in sentencing him to death.

## LEGAL STANDARDS

Through the mechanism of habeas corpus, a federal court may vacate a state prisoner's conviction or sentence where that prisoner is being held in violation of the United States Constitution or other federal laws or treaties. *See* 28 U.S.C. § 2254; *McGowan v. Miller*, 109

F.3d 1168, 1172 (7th Cir. 1997).   Traditionally, state court legal conclusions, including mixed

questions of law and fact, are reviewed de novo; however, that standard has been tempered by

the Antiterrorism and Effective Death Penalty Act's ("AEDPA's") deferential standards. *Sanchez*

*v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999), *cert. denied*, 120 S. Ct. 1724 (2000).[1]   A federal

court may only grant a prisoner's § 2254 petition if the state court's "adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States; or - (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented..."   28 U.S.C. § 2254(d).   *See also Weeks v. Angelone*, 120 S. Ct. 727, 734

(2000); *Coleman v. Ryan*, 196 F.3d 793, 795-96 (7th Cir. 1999).   In addition, determinations of

factual issues made by the state court are presumed to be correct; the petitioner has the burden of

rebutting them by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The U.S. Supreme Court only recently addressed the new standard.

Under the 'contrary to' clause, a federal habeas court may grant the writ if the
state court arrives at a conclusion opposite to that reached by this Court on a
question of law or if the state court decides a case differently than this Court has
on a set of materially indistinguishable facts.  Under the 'unreasonable application'
clause, a federal habeas court may grant the writ if the state court identifies the

---

[1] Petitioner has raised some claims regarding the applicability of certain provisions in
Chapter 154 of the Antiterrorism and Effective Death Penalty Act, as Petitioner maintains Illinois
does not meet the relevant standards.  Petitioner appears to have a point. *See Pitsonbarger v.
Gramley*, 141 F.3d 728, 732 (7th Cir. 1998), *cert. denied*, 525 U.S. 984 (1998).  However, this
claim does not affect our analysis, as Petitioner's petition was filed after the effective date of the
Act.  Both Chapters 153 and 154 of the Antiterrorism and Effective Death Penalty Act ("Act")
unquestionably apply to cases filed after the Act took effect (April 24, 1996). *See Williams v.
Taylor*, 120 S. Ct. 1479, 1486 (2000); *Lindh v. Murphy*, 117 S. Ct. 2059, 2067(1997).  In
addition, the relevant standard of review is the same, as Chapter 154 incorporates the standards
of § 2254(a), § 2254(d), and § 2254(e). *See* 28 U.S.C. § 2264(b).

correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 120 S. Ct. 1495, 1523 (2000). "[A]n unreasonable application of federal law is different from an incorrect or erroneous application of federal law." *Id.* at 1522. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of the clearly established federal law was objectively unreasonable." *Id.* at 1521 (rejecting the "all reasonable jurists" standard). The Supreme Court's formulation does not appear to be significantly different than the formulation the Seventh Circuit has developed in its AEDPA cases. *See, e.g., Sanchez*, 189 F.3d at 623 ( "[T]he 'criterion for assessing the reasonableness of a state court's application of Supreme Court case law, pursuant to §2254(d)(1), is whether the determination is at least minimally consistent with the facts and circumstances of the case.'" )(quoting *Sweeney v. Park*, 113 F.3d 716, 718 (7th Cir. 1997)); *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir.), *cert. denied*, 522 U.S. 907 (1997)("The statutory 'unreasonableness' standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes"). As Judge Evans succinctly put it "[t]he upshot of all this is that federal review is now severely restricted; the fact that we may think certain things could have been handled better by the state trial judge or by the prosecuting attorney or by a state reviewing court means very little." *Sanchez*, 189 F.3d at 623.[2]

_____

[2] During the course of this court's analysis, we will, as always, utilize Seventh Circuit cases for guidance. However, under the AEDPA standard, which focuses on the Supreme Court's holdings, the relevance of our appellate court's precedent may vary. The Seventh Circuit's AEDPA cases are of course dispositive (e.g., the Seventh Circuit concluding that a certain state court ruling is contrary to relevant Supreme Court precedent). Pre-AEDPA cases also provide guidance. For example, if the Seventh Circuit concluded a certain state ruling passed muster under the prior, higher standard, it would be difficult to conclude a similar ruling was "unreasonable" under the new, more deferential standard. However, it would appear that the

Further, a federal court may not review the merits of claims raised in a § 2254 petition unless the petitioner has (1) exhausted all the remedies available to him in state court; and (2) fairly presented his federal claims in state court first. *McGowan*, 109 F.3d at 1172. To exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 119 S. Ct. 1728, 1732 (1999). In sum, a petitioner can procedurally default a claim by completely failing to raise the claim in the state court system or where the state court has declined to address the merits of the claim because of petitioner's failure to comply with a state procedural rule or where petitioner failed to properly appeal his claim in the state court system. *See U.S. ex rel. Johnson v. Tally*, 47 F. Supp. 2d 943, 947 (N.D. Ill. 1999). If a petitioner has procedurally defaulted a claim, a federal court cannot reach the merits of that claim unless the petitioner demonstrates (1) cause for and actual prejudice arising from failing to raise the claim as required, or (2) that enforcing the default would lead to a "fundamental miscarriage of justice." *Steward v. Gilmore*, 80 F.3d 1205, 1211-12 (7th Cir.1996) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). The fundamental miscarriage of justice exception requires a claim that the petitioner be actually innocent of the crime. *Id.* at 1212. *See also Britz v. Cowan*,192 F.3d 1101, 1103 (7th Cir. 1999), *cert. denied*, 120 S. Ct. 1274 (2000) ("Waiver will be forgiven, however, if the petitioner can show that he was 'actually' and not merely 'legally' innocent of the criminal charges against him.")

The availability of an evidentiary hearing has also been restricted under AEDPA:

---

contrary may not be automatically true.

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "[A] failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some other greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 120 S. Ct. at 1488. "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court...." *Id.* at 1490 ("Diligence" requires, at minimum, that the prisoner seek an evidentiary hearing in state court). A prisoner who has been diligent will be excused from the provision's stringent requirements. *Id.* at 1491.

## DISCUSSION

### A. Batson Claim

Petitioner maintains that the Illinois courts erred in concluding that he had not established a prima facie case under *Batson*. Petitioner notes the following: (1) the Illinois court improperly failed to consider the results of the first venire (2 out of 3 of prosecutor's peremptory challenges excluded blacks); (2) 6 out of 10 of prosecutor's subsequent peremptory challenges were used to exclude blacks; (3) the prosecution's use of peremptory challenges against blacks was grossly

disproportionate to number of blacks on venire (30%); (4) blacks made up only 21% of jury; (5) the Illinois courts used the wrong standard ("systemic exclusion" vs. "all relevant circumstances"); (6) Illinois court did not properly consider that Petitioner was black; and (7) Illinois court did not properly consider similarities between excluded blacks versus accepted white jurors.[3] The Respondent maintains that the claim is meritless, as the Illinois Supreme Court reached the proper result after applying the proper legal standard.

## 1. Legal Standard

There is no doubt that the Supreme Court has clearly established that a state denies a defendant equal protection under the law when it puts him on trial before a jury from which members of his race have been deliberately excluded because of their race. *See Batson v. Kentucky*, 476 U.S. 79 (1986). As such, a prosecutor is forbidden to "challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89. Harm from such conduct goes beyond the defendant and the excluded juror, and extends to the community in diminished public confidence in the fairness of our judicial system. *Id.* at 87. To establish a prima facie case of discrimination in the selection of petit jurors based on the prosecutor's exercise of peremptory challenges, the defendant must show: (1) that he is a member of a cognizable racial group; (2) that the prosecutor used peremptory challenges to remove members of defendant's racial group from the venire; and (3) "that these facts and any other relevant circumstances raise"

---

[3] Petitioner also argues that the Illinois Supreme Court decision was not on the merits because they employed a deferential standard of review. This claim is baseless. By petitioner's reasoning, a jury verdict, which was reviewed deferentially and affirmed by the appellate court on a sufficiency of the evidence claim, would not be an "on the merits" determination.

an inference that the prosecutor used his challenges to exclude potential jurors based on their race. *Id.* at 96. The defendant is entitled to rely on the fact that peremptory challenges enable "those to discriminate who are of a mind to discriminate." *Id.* (internal cite omitted). In deciding whether a defendant has established a prima facie case, the trial court must consider all relevant circumstances, including such matters as a "pattern" of strikes against black jurors in the venire and the prosecutor's questions and statements in voir dire and in exercising his challenges. *Id.* at 96-7. "We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case...." *Id.* at 97. Once the defendant establishes a prima facie case, the burden shifts to the state to present a race neutral explanation for the challenges to black jurors. *Id.* "Batson is violated if even a single potential juror is excluded for an impermissible reason." *Coulter v. Gilmore*, 155 F.3d 912, 919 (7ᵗʰ Cir. 1998) (citing *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142n.13 (1994)).

### 2. State Court Decision

The Illinois Supreme Court rejected Petitioner's *Batson* claim after a lengthy analysis.[4]

> Defendant first challenges his convictions on the basis that, in selecting the jury which convicted him, the prosecution purposefully discriminated against black venire members when exercising peremptory challenges, and thus violated the equal protection clause of the fourteenth amendment ( U.S. Const., amend. XIV), as construed in Batson v. Kentucky (1986), 476 U.S. 79, 106 S. CT. 1712, 90 L. ED.2d 69. The Supreme Court in Batson held that the prosecution denies a defendant his rights under the equal protection clause if the prosecution exercises peremptory challenges so as to purposefully exclude members of a defendant's race

---

[4]For ease of analysis and the reader's benefit, the state court's discussion of each issue will be presented essentially in its entirety. State court citations and other text not relevant to our review may be omitted.

from the jury. In order to establish a Batson claim, a defendant has to first establish a prima facie case by showing that he is a member of a cognizable racial group and that the prosecution exercised peremptory challenges to exclude from the jury venire members who share his race, and by pointing to any other relevant circumstances that raise an inference of purposeful discrimination by the prosecution.... In this case, the issue is whether the trial court erred in ruling that defendant had not established a prima facie case.

After a jury of 12 and 2 alternate jurors had been sworn, but before opening statements had been made, defense counsel moved for a mistrial on the basis that the prosecution had systematically excluded black venire members from the jury through the exercise of peremptory challenges. Defense counsel noted that of the nine venire members peremptorily challenged by the prosecution, six were black (appellate defense counsel acknowledges that the prosecution actually used ten, not nine, peremptory challenges). Defense counsel further noted that the jury chosen consisted of four white males, six white females (two of whom were apparently Hispanic), and two black females. The two alternate jurors were a black male and a white female. To buttress his motion, defense counsel also referred to the prosecution's exercise of peremptory challenges during the aborted voir dire of the first venire called in this case: Of the three peremptory challenges exercised by the prosecution during voir dire of this first venire, two were exercised against blacks. (Voir dire of the first venire proceeded only as far as the selection of a panel of four jurors, at which time the entire venire and the four jurors chosen from it were dismissed by the trial judge because the judge, without objection from counsel, excused one of the four chosen jurors, the only black on that panel, after finding that the juror would not be able to fully concentrate on the case, and because the defense refused to accept the broken panel of jurors.) In framing his Batson claim on appeal, defendant has also included those three peremptory challenges exercised by the prosecution during voir dire of the first venire. The trial court reserved ruling on defendant's motion for a mistrial until the morning of the next day.

At that time one juror, apparently one of the two Hispanic females, who had told the trial judge that she would be unable to concentrate on the trial owing to serious personal problems, was brought into chambers to repeat her concerns in the presence of the lawyers. The judge excused this juror without objection. The first alternate, a black male, then became a juror.

The judge then denied defendant's motion for a mistrial, finding that the prosecution had not systematically excluded blacks from the jury and therefore would not have to explain the reasons for its challenges, and thereby implicitly finding that defendant had not made a prima facie case of purposeful discrimination as required by Batson. In announcing its ruling, the court documented the jury selection procedure that had been used, the racial makeup of the jury, and the peremptory challenges used by the prosecution.

Because the record is unclear as to certain facts, in evaluating defendant's claim of purposeful discrimination, we have had to make our own review of the record to determine the number of challenges exercised by the parties and the races of those challenged by the prosecution. We have found the following pertinent facts, construing any ambiguity in the record against defendant, who had the burden of preserving the record.... The jury selection procedure used was to seat panels of venire members (three panels were seated, numbering 14, 14, and 12), have the trial judge inquire of them initially, and then allow inquiry first by the defense and then by the prosecution as to the first panel, and first by the prosecution and then by the defense as to the second and third panels. Following the questioning of each panel, the defense and the prosecution gave the trial judge a list of those venire members whom they challenged, without revealing these challenges to the opposition. This procedure was used on the recommendation of defense counsel.

Of the 40 venire members examined, 3 were excused for cause. Prosecution and defense were each allotted 14 peremptory challenges; the prosecution used 10, while the defense used 13. Of the 10 peremptory challenges exercised by the prosecution, 6 were exercised against blacks. Of the 27 venire members accepted by the prosecution, 5 were black. After the defense exercised its challenges, 3 of the 14 venire members chosen to serve as jurors or alternates, and 3 of the 12 jurors who convicted defendant (the black alternate became a juror after the first day of testimony), were black. The relevant racial statistics are thus: 30% of the pool of 37 venire members not challenged for cause was black, compared to black representation of 19% among the 27 venire members accepted by the prosecution; also, 60% of the State's 10 peremptory challenges were exercised against the black 30% of the venire, and 21% of the 14-member jury was black.

In determining whether the trial judge correctly ruled that defendant failed to establish a prima facie case of purposeful discrimination, we constrain our inquiry in certain ways: We consider the voir dire of the second venire only; we disregard any racial distinction between Hispanic and white venire members; and we consider the jury as a group of 14 which includes the 2 alternates selected, not as a jury of 12.

Contrary to defendant's urging, we decline to consider the prosecution's peremptory challenges to members of the first venire, before that venire was dismissed. As stated, a panel of four jurors was initially selected from the first venire, and in selecting this panel the prosecution exercised three peremptory challenges two of which were against blacks. We decline to consider these challenges because we recognize that attorneys approach the selection of a jury as one entire process, during which an attorney individually assesses each venire member's character, views, and impartiality, and then decides which venire members to challenge and which to accept while reserving a sufficient number of challenges for use against those venire members who have not yet been

questioned. Given the complex strategic nature of the jury selection process and the exercise of peremptory challenges, we find that the facts involved in the selection of a single panel of four jurors are not probative of whether the prosecution purposefully discriminated in the selection of a full jury. For the same reason, we reject the State's approach of analyzing the racial balance of the prosecution's challenges by separately analyzing its challenges to each of the three panels of venire members seated from the second venire, as well as its challenges as a whole.

We disregard the racial distinction between Hispanic and white venire members accepted by the prosecution, a distinction which the trial judge apparently relied on in part, for he mentioned the presence of two Hispanics on the jury, making a total of "five minority people." Because defendant is black, the only relevant racial distinctions among venire members in this case are black and nonblack. In establishing a prima facie case of prosecutorial discrimination against venire members of a defendant's race, a defendant can only rely on the prosecution's exercise of "peremptory challenges to remove from the venire members of the defendant's race" (Batson, 476 U.S. at 96, 106 S. CT. at 1723, 90 L. ED.2d at 87; ...). By the same token, we find that, in determining whether a prima facie case is established, it is irrelevant whether the prosecution accepted some venire members who belonged to a racial minority other than that of defendant.

Because of the method of jury selection used in this case, we include in our review not only the 12 original jurors, but also the 2 alternate jurors. The jury was selected from three panels of venire members, numbering 14, 14, and 12. By the time the third panel was called, 10 jurors had been selected. Thus, when the final panel of 12 was questioned, 2 jurors and 2 alternates were needed. Once again, the prosecution and the defense simultaneously submitted to the trial judge their challenges. The result was that 8 of these 12 venire members were challenged and 4, the exact number of jurors needed, were accepted. Of the four accepted, the first two who had been called became jurors, while the other two became the first and second alternates. Given this procedure of selecting the alternates from the same venire panel as the jurors, not from a separate panel, and given the fact that it was impossible for the prosecution to know, at the time it exercised its challenges, that the black male venire member whom it accepted would not initially be seated as a juror, we find the races of the two alternate jurors to be relevant in deciding defendant's claim. (The black male, Juror M, was the fifth venire member called; the defense had three peremptory challenges remaining and the prosecution had eight; if the prosecution had wanted to minimize the likelihood of Juror M's becoming a juror, as opposed to an alternate juror, yet had been hesitant to strike him, it would not have challenged any of the four venire members who preceded Juror M, hoping the defense would not use all three of its challenges against three of the first four venire members; but in fact the prosecution challenged the third venire member, a white female.)

With this understanding of the factual boundaries of our review, we consider the arguments of the parties. The first decision we must make is whether defendant is able to present a Batson claim to us, for the State asserts that this claim was waived because defendant's objection to the prosecution's use of peremptory challenges was untimely. The State is correct; defendant waived his Batson claim by voicing his objection and moving for a mistrial in an untimely manner, not doing so until after the jury had been sworn.... Nonetheless, we consider defendant's Batson claim because, for its part, the State's right to raise defendant's waiver was itself waived when the prosecution neglected to argue the untimeliness of defendant's motion at the time the motion was made, and instead attacked the motion's merits....

On the merits of his claim, defendant contends that the numerical racial imbalance of the prosecution's peremptory challenges, 6 of 10 being exercised against blacks, alone raises an inference of purposeful discrimination and establishes a prima facie case. Defendant cites cases in which the appellate court found a prima facie case established by similar numbers.... Besides the black-nonblack ratio of prosecution challenges, defendant argues that the following facts create an inference of purposeful discrimination: The prosecution struck all six blacks without asking them any questions probative of their backgrounds or impartiality, striking two of the six without asking them any questions, and striking the other four after asking such general questions as whether they could give the State a fair trial; the challenged blacks were heterogeneous in all respects except race; the only respect in which the challenged blacks could be distinguished from the white jurors was by race; and defendants in Cook County frequently claim that the prosecution systematically excluded blacks from their juries. Defendant discounts the relevancy of the fact that three blacks served on his jury, arguing that the issue is whether the prosecution discriminated against any of the six blacks it struck, not whether it failed to discriminate against the three black jurors.

Responding to defendant's arguments, the State reminds us that a prima facie case of purposeful discrimination cannot be established merely by the number of blacks stricken by the prosecution ..., and mentions other factors which this court has found relevant in ruling on a Batson claim. Also, the State makes the odd assertion that when each panel of venire members is examined individually it becomes apparent that "the prosecution exercised practically the same number of peremptory challenges to remove whites as blacks"; we have already rejected the method of analyzing Batson claims by fragmenting the jury selection process. Next, the State points out that the prosecution accepted at least one black from each panel and argues that this shows the prosecution did not exclude as many blacks as it could have done, a relevant factor (see, e.g., United States v. Montgomery (8th Cir.1987), 819 F.2d 847, 851). In addition, the State believes that any inference of discrimination is undercut by the fact that 25% of the jurors, 3 of 12, were black, about the same as the percentage of the Cook County population 18 years old and older.

The State also contends that more than race distinguishes the stricken black venire members from white venire members accepted by the prosecution. Whereas many of the accepted white venire members were crime victims, one had a friend who had been raped, one had been a parole officer, one was training to be a policeman, and others knew lawyers and police officers, five of the six stricken black venire members did not share these characteristics. The State also claims that several of the stricken blacks had characteristics which the prosecution may have considered to be unfavorable; we find the factual support for this latter claim to be extremely weak. Additionally, the State claims the stricken blacks were similar in respects other than race, yet supports this claim merely by stating that most of them (in reality only three of six) lived alone and were single. The State also notes that the record does not evidence the age of each venire member, a possibly legitimate distinguishing factor. The State denies that the number of times defendants in Cook County have claimed prosecutorial discrimination during jury selection is relevant; while the number of such claims proved might be relevant, defendant did not provide that information. On the other hand, one relevant fact in this case is that the victim and most of the witnesses are black, as is defendant, tending to negate a discriminatory motive by the prosecution.... As a final point, the State mentions this court's previous holding that a trial court's finding that a defendant has not established a prima facie Batson claim will be overturned only if against the manifest weight of the evidence ..., and the Supreme Court's comment in Batson that a reviewing court should give "great deference" to a trial court's finding on intentional discrimination because it largely depends on an assessment of credibility (Batson, 476 U.S. at 98 n. 21, 106 S. CT. at 1724 n. 21, 90 L. ED.2d at 89 n. 21).

Defendant responds to these arguments by asserting that, though the State claims that one possible reason for the prosecution's striking five of the six excluded black venire members is that they lacked characteristics the prosecution might have seen as favorable, some of the accepted nonblack jurors likewise lacked these characteristics (significantly, defendant limits his argument only to nonblack jurors, excluding from his analysis those nonblack venire members accepted by the prosecution but stricken by defendant); the State fails to provide credible facts to support its argument that any stricken black venire members had characteristics unfavorable to the prosecution; and the characteristics of being single and living alone, cited by the State as a nonracial difference between the stricken blacks and the accepted non-blacks, not only were not possessed by three of the stricken blacks, but in fact were possessed by two white jurors. Defendant disputes that the fact that defendant, the victim, and many witnesses were black militates against the prosecution's possessing a discriminatory motive. For one thing, discrimination is illogical--if the prosecution was " 'of a mind to discriminate' " (Batson, 476 U.S. at 96, 106 S. CT. at 1723, 90 L. ED.2d at 87, quoting Avery v. Georgia (1953), 345 U.S. 559, 562, 73 S. CT. 891, 892, 97 L. ED. 1244, 1248), it may have concluded that black jurors would be less likely to convict a black defendant even

if the murder victim was also black. Furthermore, defendant thinks the two most crucial prosecution witnesses were a white policeman and a white assistant State's Attorney, both of whom testified to defendant's questioning on the night of July 17, 1986, when he confessed. Defendant also denies that the trial court's finding of no prima facie case should be given any deference by us, for the quotation the State took from Batson regarding the deference to be given to a trial court's ruling referred to a trial judge's analysis of neutral explanations offered by the prosecutor, at which time a trial judge assesses the prosecutor's credibility (Batson, 476 U.S. at 98 n. 21, 106 S. CT. at 1724 n. 21, 90 L. ED.2d at 89 n. 21).

The standard of review we apply, in determining whether the trial judge erred in ruling that defendant had failed to establish a prima facie case of purposeful prosecutorial discrimination against black venire members, is whether this ruling is against the manifest weight of the evidence. ... In making this determination, because defendant has first shown he is a member of a cognizable racial group and members of the same racial group were peremptorily challenged by the prosecution (Batson, 476 U.S. at 96, 106 S. CT. at 1723, 90 L. ED.2d at 87 (first element of a prima facie case)), we will consider all facts which reasonably indicate or refute purposeful discrimination by the prosecution, not just the number of challenges exercised against black venire members .... Other factors from which an inference of discrimination can be drawn are: a disproportionate number of strikes against blacks, especially when so disproportionate as to present a "pattern" ...; the level of black representation on the jury as compared to the venire ...; whether the stricken black venire members are heterogeneous in every respect except race ...; the prosecutor's questions during voir dire and statements when exercising challenges ...; and the race of the defendant, victim, and witnesses....

Viewing all the relevant facts of this case, we cannot say that the trial court's finding that defendant failed to establish a prima facie case is against the manifest weight of the evidence. The only factor strongly suggesting purposeful discrimination is the disproportionality of the prosecution's challenges to black as opposed to non-black venire members; 6 of the prosecution's 10 peremptory challenges, or 60%, were used against blacks, who constituted only 30% of the venire members not excused for cause. Yet this disproportionality is not so severe that it creates a "pattern." All other relevant factors tend to refute the idea of discrimination, weigh neutrally in the balance, or mildly tend to suggest discrimination.

A factor that tends to refute an inference of discrimination, or whose value is, at most, neutral, is that this black defendant was found guilty of raping and murdering a young black woman. Despite defendant's view that the illogical nature of discrimination makes a crime's racial character irrelevant, we have to employ logic in our analysis; thus, we find that, when deducing the existence of a prima facie case of purposeful discrimination, whether or not the defendant and the defendant's victim are members of the same cognizable racial group is a relevant factor .... In a case where the defendant is black and the victim is white, we

recognize, at the prima facie stage of establishing a Batson claim, that there is a real possibility that the prosecution, in its efforts to procure a conviction, will use its challenges to secure as many white jurors as possible in order to enlist any racial fears or hatred those white jurors might possess. On the other hand, in a case where both the defendant and victim are black, their racial characteristics do not warrant an inference, at the prima facie stage, that the prosecution discriminated against venire members who were black. Furthermore, we refuse to conclude that the fact that the defendant is black supports an inference of prosecutorial discrimination regardless of the victim's race.

Nor do we infer a discriminatory motive by the prosecution from the fact that the assistant State's Attorney who elicited defendant's confession and the police officer who testified to the course of the murder investigation were white. In fact, we believe the "star" prosecution witness was Anthony Woodard, the black youth who provided the only evidence, other than defendant's confession, that defendant sexually assaulted Boyd and drove off with her in the trunk of his car in the early morning hours of July 13, 1986.

In this case, the heterogeneity of the stricken black venire members is a neutral factor. Our review of the record shows that five of the six were nondiverse in respects other than race. Five of the six were single and had a college education; three of these five lived alone and the other two lived with immediate family. The sixth stricken black venire member was separated from her husband, had three daughters ranging in age from 22 to 30, apparently lived alone, and was unemployed, as were two of her three daughters. While these six venire members did not share identical backgrounds, and while it is true that the prosecution accepted white venire members who were single and lived alone, at this stage of a Batson claim we are only concerned with whether the stricken black venire members shared any characteristics other than race; it is not our role to search for possible reasons for the prosecution's strikes or for similarities between stricken black and accepted white venire members.

Another neutral factor here is the number and nature of the questions the prosecutor asked stricken black venire members and the statements the prosecutor made when exercising challenges. True, the prosecutor failed to ask any probative questions about the stricken black venire members' backgrounds or personalities; but, the fact is, the prosecutor failed to ask such probative questions of any venire members, black, white, or Hispanic. With one exception, the prosecutor limited his questions to general "fair trial" kinds of questions; the one exception was the prosecutor's asking a female black venire member, whom the prosecution accepted and who became a juror, about an attack on her husband and his crippling on-the-job injury. When exercising its challenges, the prosecution made no statements.

The final relevant factor is the level of black representation on the jury as compared to the venire, and here there is some support for an inference of discrimination. Of the 37 people not excused for cause, 11 were black, or 30%;

of the 14-member jury there were 3 blacks, or 21%; and of the 27 venire members accepted by the prosecution, 5 were black, or 19%. Thus, there was a slight disparity between the level of black representation on the venire, 30%, and that on the jury, 21%.

In sum, considering all the relevant factors, only two factors (the percentage of blacks on the venire not excused for cause compared to the percentage of the prosecution's peremptory challenges exercised against and as compared to the percentage of blacks on the jury) tend slightly to suggest purposeful discrimination, while the others are either neutral or tend to refute such a suggestion. Therefore, we cannot say the trial court's finding that defendant failed to establish a prima facie case of purposeful discrimination by the prosecution's exercise of peremptory challenges is against the manifest weight of the evidence.

*See* 142 Ill.2d at 277-91, 568 N.E.2d at 1244-50, 154 Ill. Dec. at 795-80.

## 3. Analysis

At the outset, we note the Illinois Supreme Court cited *Batson* and recited the correct elements of a prima facie case. The question appears to be whether the Illinois court reasonably applied the *Batson* standard or reached any conclusions contrary to *Batson*.

Two of Petitioner's claims can be dispensed with quickly. First, given that Petitioner's primary emphasis is on the pattern of strikes, the first venire is of limited, if any, significance. If it is considered, the percentage of challenges against blacks changes little, from 60% (6 of 10) to 61.5 % (8 of 13). Second, a review of the record indicates that the trial court's reference to "systemic exclusions" appears to be a poor word choice rather than the application of the wrong standard. *See generally McCain v. Gramley*, 96 F.3d 288, 293-94 (7th Cir. 1996). Given the newness of *Batson* at the time of Petitioner's trial, the judge might still have been using the "old" vocabulary. The misstatement may also have been prompted by defense counsel and the prosecutor's use of the term in discussing how *Batson* altered *Swain*. (*See* State Criminal Trial Transcript at pp. 1110-1114.) While it is unclear what standard the state trial judge used, it

appears, at bottom, that the trial judge considered the composition of the jury, the pattern of strikes, and the other circumstances that he observed during the jury selection process through the prism of his trial experience. (*See* State Criminal Trial Transcript at pp. 1340-43.)   More significantly, however, any confusion as to the standard the trial court applied drops out because the Illinois Supreme Court clearly acknowledged the *Batson* standard.  Moreover, the Illinois Supreme Court specifically stated that it would "consider all facts which reasonably indicate or refute purposeful discrimination...."  *See* 142 Ill.2d at 287, 568 N.E.2d at 1248, 154 Ill. Dec. at 799.  This statement indicates the court, while using somewhat different verbiage, essentially applied the *Batson* "all relevant circumstances" standard.

We will next examine the Illinois Supreme Court's handling of the "pattern" of challenges. We note at the outset that the Illinois court correctly concluded that a percentage of strikes against black jurors in a higher percentage than their representation on the entire venire is not dispositive. *See McCain*, 96 F.3d at 292.  This result flows directly from *Batson*, which instructed that a disproportionate pattern of strikes was **one** factor to consider in assessing all relevant circumstances.  As to the actual numbers, blacks made up 30% of the venire, the prosecution used 60% of their peremptory challenges against blacks (6 of 10, with 4 unused), blacks made up 21% of the initial jury (3 blacks (including one alternate) in the original panel of 12 jurors and 2 alternates), and the jury that ultimately convicted the Petitioner was 25 % black (3 of 12).

In *McCain*, the Seventh Circuit, applying the AEDPA standard, concluded that a prima facie case under *Batson* had not been established.  While blacks were stricken at a much higher percentage than their representation in the venire (40% of challenges but only 16.66% of the

venire), the total number of strikes was not significant (2), the number of strikes was not against a significant number of the black venire persons as a whole, and the final jury had approximately the same percentage of blacks as the venire. *Id.* These facts are comparable to those in Petitioner's case, which makes it difficult to conclude the state court's analysis was "unreasonable" in addressing the pattern of strikes. Cases going the other way typically have far more egregious patterns of strikes. *See generally Mahaffey v. Page*, 162 F.3d 481 (7th Cir. 1998), *cert. denied*, 119 S. Ct. 1786 (1999) (all blacks on venire excluded); *Coulter v. Gilmore*, 155 F.3d 912 (7th Cir. 1998) (90% of strikes against black venire members). In sum, the state court's analysis of the pattern of strikes, in an of itself, does not warrant ordering a new *Batson* hearing.

Petitioner's claim that the state court inappropriately discounted his race, because the victim and key witness were also black, is ultimately unpersuasive. Petitioner is correct that *Batson* does not simply focus upon black defendants and white victims and the risk a prosecutor might seek an all-white jury to take advantage of possible racial animus to obtain a conviction, but also addresses the stereotype that a black juror cannot fairly and objectively assess the evidence against a black defendant. Petitioner is also correct that some of the state court's comments could be construed as viewing *Batson* as only significant in "racially sensitive" cases.

Nonetheless, while the fact that a defendant is a member of a minority group is clearly part of a prima facie case under *Batson* (which the Illinois court properly acknowledged), it is obviously not dispositive by itself or the rest of the *Batson* "all relevant circumstances" formulation would be redundant. Moreover, the Supreme Court itself has stated that race may weigh differently in different circumstances. *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (significance of strike against minority venire member may vary depending on relative

number of minority persons in venire). *See also Mahaffey*, 162 F.3d at 485 (noting special racial sensitivity issues). The state court's conclusion that Petitioner's race was not a significant factor, given the lack of special racial sensitivity in the case and the presence of other blacks in the venire and on the jury, does not appear to be contrary to established Supreme Court precedent or, in and of itself, an unreasonable application of the relevant legal principle.

Petitioner's last contention is the most troubling--that the state court specifically refused to consider similarities between excluded blacks and accepted whites in assessing whether Petitioner had established a prima facie case. Instead, the state court chose to focus on whether the excluded blacks shared characteristics with each other other than race. The state court specifically noted that the excluded black venire persons and some of the accepted white jurors shared some characteristics. *See* 142 Ill.2d at 290, 568 N.E.2d at 1250, 154 Ill. Dec. at 801.

The question becomes whether *Batson's* admonition to consider "all relevant circumstances" requires the courts to consider the similarities between excluded blacks versus accepted white jurors in assessing whether a defendant has established a prima facie case. If so, the Illinois Supreme Court's decision is contrary to or unreasonably applies the *Batson* test and cannot stand.

Neither side has cited a Supreme Court case addressing this precise issue. The Seventh Circuit has concluded that a court should consider this factor in assessing whether a defendant has established a prima facie case. *See Mahaffey*, 162 F.3d at 485-86. "[T]he trial judge should have been comparing the excused African-Americans to the jurors who remained, for only through such a comparison could the judge assess whether race played any role in the State's challenges." *Id.* at 485. "If an excused African-American juror had characteristics and opinions that were

similar to those of a juror who sat, for example, then an obvious inference, at least prior to the articulation of a race-neutral explanation for the strike, would be that the strike was racially motivated." *Id.* at 485-86. The *Mahaffey* court specifically noted that the state trial judge acknowledged similarities between blacks who were excluded and whites who were permitted to serve. *Id.* at 486. "[T]he crucial and determinative inquiry in a Batson claim is whether the state has treated similarly situated venirepersons differently based on race." *Coulter*, 155 F.3d at 921.

Unfortunately, for purposes of our analysis, the *Mahaffey* court applied the pre-AEDPA standard. Under AEDPA, that a state court decision conflicts with a federal circuit court pronouncement interpreting a Supreme Court case may not necessarily be sufficient to warrant overturning it as contrary to/an unreasonable application of the Supreme Court case. What we must now decide is whether the *Mahaffey* rule flows so clearly from the Supreme Court's *Batson* formulation that the Illinois Supreme Court's conclusion was contrary to *Batson* or, at minimum, an unreasonable application of the *Batson* standard. A careful review of *Batson* indicates the answer is yes.

The Supreme Court gave two examples (not all inclusive) of matters a court should consider as among "all the relevant circumstances" in determining whether a defendant has established a prima facie case: the pattern of strikes and the questions asked by the prosecutor during voir dire. It is the latter that suggests our answer. If a prosecutor questions blacks significantly differently than whites (e.g., only blacks get questioned or only blacks get questions tailored to exclude), a potential inference of discrimination, at least for purposes of a prima facie case, arises. Similarly, and this appears to be the principle of *Mahaffey*, if a prosecutor reacts differently to the same answers to the same questions (either during voir dire or on the juror

information cards[5]) by blacks and whites, there arises, at least for purposes of establishing a prima facie case, an inference of possible discrimination. Significantly, the state court's test—whether the excluded blacks share characteristics with each other other than race–lacks a certain degree of logic. That the excluded blacks share characteristics other than race gives one no comfort that discrimination has not taken place if white jurors with those same characteristics are permitted to serve as jurors.

In sum, *Batson* compels the conclusion that similarities between excluded minority jurors and accepted white jurors is a relevant circumstance to be considered in determining whether a defendant has established a prima facie case. As such, the Illinois Supreme Court's decision to specifically disregard such information was contrary to, or an objectively unreasonable application of, the *Batson* standard. While some blacks did serve on Petitioner's jury, the exclusion of even one juror of Petitioner's race for a discriminatory reason violates *Batson*. Moreover, a *Batson* violation is a "structural" flaw in the trial that is not subject to a harmless error analysis. *See Ashford v. Gilmore*, 167 F.3d 1130, 1136 (7th Cir. 1999), *cert. denied*, 120 S. Ct. 1717 (2000)(citing *Vasquez v. Hillery*, 474 U.S. 254 (1986); *Rosa v. Peters*, 36 F.3d 625, 634n.17(7th Cir. 1993). "[W]hen a petit jury has been selected upon improper criteria or has been exposed to prejudicial pretrial publicity, we have required reversal of the conviction because the effect of the violation cannot be ascertained." *Vasquez*, 474 U.S. at 263.

This court must hold that the Petitioner is entitled to a new hearing in the Illinois courts on his *Batson* claim. That such a hearing may be rendered difficult by the passage of time does not alter this calculus, *see Vasquez*, 474 U.S. at 264- 265, nor does the possibility that a retrial may

---

[5] In this case, it appears the prosecutor asked few questions.

prove necessary if holding a belated *Batson* hearing is impracticable. *See Rosa*, 36 F.3d at 634-35.

## B. Waiver of Sentencing Jury

Petitioner maintains that the State violated his 6th, 8th, and 14th Amendment rights because his waiver of a sentencing jury was invalid. Petitioner maintains that his waiver was not "knowing" because the state judge misinformed him regarding the jury's role in the eligibility phase of his death penalty hearing and that no one informed him about Illinois' "one- juror" rule (no death penalty imposed if one juror votes against it). The Respondent maintains the waiver was valid because Petitioner consulted with his counsel, was fairly informed of his options, and executed a written waiver. In addition, the Respondent argues that no established "constitutional rule" is implicated by Petitioner's claim.

### 1. Legal Standard

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). A waiver will not necessarily be invalid because a defendant "lacked 'a full and complete appreciation of all of the consequences flowing' from his waiver;" the waiver will stand if the information provided "to him satisfied the constitutional minimum." *Patterson v. Illinois*, 487 U.S. 285, 294 (1988)(internal cite omitted).

### 2. State Court Decision

The Illinois Supreme Court rejected this claim on direct appeal.

Defendant's first challenge to the conduct of the death penalty sentencing hearing is that because the trial judge incorrectly explained the procedure used when a jury decides whether a death sentence should be imposed, he did not knowingly and intelligently waive his right to have a jury at the sentencing hearing. Although "[t]he right to a sentencing jury in a capital case is a statutory, not a constitutional, right" ..., a defendant's waiver of this right has to be knowing and intelligent .... The error the trial judge made was to tell defendant that, regardless of whether he (the judge) or a jury sentenced defendant, he would make the initial decision on defendant's eligibility for the death penalty, instead of correctly telling defendant that, if defendant elected to have a jury sentence him, it would be the jury that would have to find, unanimously, that defendant was eligible for the death penalty (Ill.Rev.Stat.1985, ch. 38, par. 9-1(g)).

Defendant is correct that the trial judge misstated the law when he told defendant, before trial, that, if defendant chose to be sentenced by a jury, the following would occur:

"If you are found guilty there first has to be a hearing to determine whether or not you are eligible for the Death Penalty. There is [sic] a number of factors that enter into that and it is a decision I make as the Judge. Assuming that you were eligible for the Death Penalty then there has to be a hearing by the same Jury who decided guilt or innocence as to whether or not that penalty is appropriate for you as an individual pertaining to this crime and the other factors that I'm sure you have gone over with your lawyer."

The trial judge further informed defendant he had a right to be sentenced by a jury; if he waived this right the jury would decide only his guilt or innocence and the judge would decide whether he should be sentenced to death. In response to the judge's questions, defendant confirmed a number of times that, after talking with his attorney, he wished to waive his right to be sentenced by a jury; he also signed a written waiver.

Despite the trial judge's misstatement, we find defendant's waiver to have been knowing and intelligent. Defendant's attorney told the judge that he had previously discussed the issue of a sentencing jury with his client (and, just minutes before defendant voiced the waiver, he and his attorney again discussed it); he also told the judge that defendant had decided to waive a sentencing jury, and he affirmatively answered the judge's question, "[D]o you feel that your client understands sufficiently to make this decision with you?" We have previously held that a waiver of a sentencing jury is knowing and intelligent, even when a trial judge does not inform a defendant of all aspects of having a jury decide the sentence and is alleged to have misstated the law, if the record shows the defendant consulted with his attorney, the defendant said he understood the consequences of waiver, and the defendant's attorney said he thought the defendant's decision was made knowingly and intelligently.... Defendant argues that those cases are inapposite because they involved the effect of a judge's failure to inform a defendant that a jury's sentencing decision would have to be

unanimous, not an affirmative misstatement of the law, as is involved here. In our opinion this distinction is irrelevant. The record shows that defendant made the waiver decision after talking with his attorney  there is no doubt in our minds that defendant's attorney was at least competent, and defendant does not claim his attorney misinformed him of the effect of a waiver and before talking to the judge; so defendant's waiver decision was not based, even in part, on the judge's misstatement of law.

Additionally, defendant argues that his waiver was not knowing and intelligent because the trial judge did not tell him that a jury's decision to sentence him to death would have to be unanimous, but defendant has not presented any reasons warranting a reconsideration of our prior holdings that it is not error to fail to so inform a defendant....

*See* 142 Ill.2d at 333-5, 568 N.E.2d at 1270-1, 154 Ill. Dec. at 821-2.

## 3. Analysis

As an initial matter, we note that the Illinois Supreme Court applied the correct legal standard--whether the waiver was knowing and voluntary. However, their conclusion, and the Respondent's current argument, that only state law is implicated by this waiver appears to be incorrect.

Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion,..., and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.

*Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). An invalid waiver of a sentencing jury would constitute a constitutional claim.

As to the merits, the first portion of Petitioner's argument is ultimately unpersuasive.

Misinformation about the role of the sentencing jury can undoubtedly invalidate a waiver. *St.*

*Pierre v. Cowan*, No. 98-3451, slip op. at 21-23, (7th Cir. June 28, 2000)(applying pre-AEDPA standard). In *St. Pierre*, the trial judge's statements may have erroneously conveyed the message that the sentencing jury would have to be unanimous to impose <u>or elect not to impose</u> the death penalty. *Id.* This affirmative misstatement would serve to completely mislead a defendant about Illinois' one-juror rule. *Id.* at 22. The state judge in this case undoubtedly misinformed the Petitioner that he, rather than a sentencing jury, would decide if Petitioner were eligible for the death penalty. However, this misrepresentation appears far less significant than the one in *St. Pierre*.

There is differing constitutional treatment accorded to the two phases of a capital sentencing hearing. *See Buchanan v. Angelone*, 522 U.S. 269, 275 (1998). In the eligibility phase, the class of defendants eligible for the death penalty is narrowed, generally through the consideration of aggravating circumstances. *Id.* In this phase, it is critical to limit discretion to ensure that "the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition." *Id.* at 275-76. In the selection phase, however, the decision is whether to impose a death sentence on a particular eligible defendant. *Id.* at 275. This phase requires "a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Id.* at 276. In this case, the trial judge's comment only misstated the mechanics of the eligibility phase.

In Illinois, in determining eligibility for a death sentence, the judge or jury must consider the statutory aggravating factors. *See* 720 ILCS 5/9-1(b). As such, the eligibility phase is fairly mechanical---assessing whether a defendant meets the listed standard. *See generally Sanchez*, 189 F.3d at 624 ("[D]efendants often concede eligibility and move directly to the aggravation-

mitigation phase of the sentencing hearing"). The trial judge engaged in just such a mechanical assessment. (*See* State Criminal Trial Record at pp. 2139.) Petitioner's eligibility was readily established by two undisputed facts–he was 18 years old or older at the time of the offense and he committed the murder during the course of another felony (aggravated kidnaping). *See* 720 ILCS 5/9-1 (b) and (b) (6)(c). The only way the result regarding eligibility would have changed is if the jury utterly disregarded the legal standard. However, "[j]ury nullification is a fact, because the government cannot appeal an acquittal, it is not a right, either of the jury or of the defendant." *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996)(a "defendant has no right to invite the jury to act lawlessly"). Unlike *St. Pierre*, who was misinformed about, arguably, the most significant aspect of the Illinois sentencing scheme, Petitioner was misinformed about an aspect of the Illinois sentencing scheme that could only have yielded a different result if the jury disregarded the law.

Petitioner's second contention, that he was not informed of the "one-juror" rule, is a bit more troublesome, as it appears to be a significant fact that a defendant should consider in evaluating the advisability of waiving a sentencing jury. However, one of our colleagues in the district court recently rejected this identical challenge. *See U.S. ex rel. Whitehead v. Page*, No. 96C5013, 2000 WL 343209 at * 17-18 (N.D. Ill. Mar. 30, 2000) (J. Williams).[6] *See also Enoch v. Gramley*, 70 F.3d 1490, 1506 (7th Cir. 1995), *cert. denied*, 519 U.S. 829 (1996). This case relied upon *DeRoberts* and *Wandick*, in which the Seventh Circuit held that a state defendant's personal knowledge of his right to participate in the selection of jurors and to only be convicted upon a substantial majority vote is not required under the constitution for a knowing and

---

[6]Judge Williams was recently elevated to the Seventh Circuit.

intelligent jury waiver. *See U.S. ex rel. Wandick v. Chrans*, 869 F.2d 1084, 1088(7ᵗʰ Cir. 1989); *U.S. ex rel. Williams v. DeRobertis*, 715 F.2d 1174 (7ᵗʰ Cir. 1983), *cert. denied*, 464 U.S. 1072 (1984). While neither *Wandick* or *DeRoberts* deal with sentencing juries, there appears to be no reason to conclude that the standard is higher for the jury that sets the penalty than the jury that determines guilt or innocence.

The matter is not clear, however. The Seventh Circuit has opined that an attorney's failure to inform his client about Illinois' "one-juror" role was ineffective assistance of counsel (prejudice results because the defendant would have had a different decision maker). *See Hall*, 106 F.3d at 752-53 (AEDPA case). *Hall* does not discuss *Wandick* and *DeRoberts* nor directly cites any Supreme Court cases precisely on point. Does this holding imply that failing to notify a defendant about the "one-juror" rule invalidates a waiver? As previously discussed, the Seventh Circuit recently held that <u>affirmatively misinforming</u> a defendant about the Illinois one-juror rule can invalidate a waiver, citing *Hall*. *See St. Pierre*, slip op at 21-3. However, *St. Pierre* does not cite any Supreme Court authority and applies the pre-AEDPA standard. Moreover, *St. Pierre* appears to concede that the issue of whether the Constitution requires a capital defendant to be informed of the unanimity requirement is an open one. *Id.* at 22. At bottom, while the call is a close one, given that *Hall* and *St. Pierre* were decided long after the Illinois Supreme Court decision here, that neither case cites directly controlling Supreme Court authority, and that both cases are factually distinguishable from the case at bar, we must conclude that the Illinois Supreme Court's decision runs afoul of no controlling Supreme Court authority. Petitioner's second claim must fail.

## C. Denial of Fair Trial—Cumulative Errors

Petitioner next claims that he was denied a fair trial due to the cumulative effect of several errors: (1) the prosecutor submitting the petitioner's entire confession to the jury, even though it contained prejudicial references to another planned crime; (2) the prosecutor eliciting testimony about prior consistent statements from a key prosecution witness; (3) the prosecutor making an improper closing argument designed to inflame the jury's emotions; and (4) the prosecutor making improper statements about the lack of fingerprint evidence.[7] The Respondent maintains this claim is waived because it was not presented as a cumulative error claim (or a prosecutorial misconduct claim regarding issues #1 and #2) to the state court, and, alternatively, that the state court correctly ruled on the individual issues.[8] Petitioner replies that the claim was not waived because the dissent addressed the cumulative error issue.

### 1. Legal Standard

Trial errors which appear harmless in isolation can, when their cumulative effect is considered, alter the course of a trial so significantly as to violate a defendant's right to due process of law. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Alvarez v. Boyd*, No. 99-3175, 2000 WL 1222097, at *4 (7th Cir. Aug. 29, 2000).

---

[7] The Petitioner's claim is confusingly presented and appeared to be stated in terms of prosecutorial misconduct, even though issues (1) and (2) are claims about the improper admission of evidence. Petitioner made it clear that he intended the claim to be a challenge to cumulative trial errors in his Memorandum in Support of his Petition.

[8] Respondent noted the state court believed certain claims were waived for failure to raise them in a post-conviction motion. However, the Illinois Supreme Court, at minimum, reviewed the merits of each claim under the plain error standard. As such, the claims appear, at least individually, to be preserved for habeas review.

"Rules of evidence are designed in the interest of fair trials." *United States v. Augenblick*, 393 U.S. 348, 352 (1969). "But unfairness in result is no measure of unconstitutionality." *Id.* "But apart from trials conducted in violation of express constitutional mandates, a constitutionally unfair trial takes place only where the barriers and safeguards are so relaxed or forgotten...that the proceeding is more a spectacle....or trial by ordeal... than a disciplined contest." *Id.* at 356. To be of constitutional significance for purposes of habeas relief, "an erroneous evidentiary ruling must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999). "This means the error must have produced a significant likelihood that an innocent person has been convicted." *Id.* at 724. As such, "evidentiary questions are generally not subject to review in habeas corpus proceedings." *Id.*

As to prosecutorial misconduct, to warrant habeas relief, a prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainright*, 477 U.S. 168, 181 (1986). *See also Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Factors considered include: (1) whether the prosecutor manipulated or misstated the evidence; (2) whether the prosecutor's comments implicated specific rights of the accused (e.g., right to remain silent, right to counsel); (3) whether prosecutor's remarks were invited by defense; (4) the weight of evidence against the accused; and (5) any corrective instructions by trial court. *Darden*, 477 U.S. at 181-83.

## 2. State Court Decision

The Illinois Supreme agreed that the disputed evidence was improperly admitted, but nonetheless rejected the Petitioner's claims.

Yet another error was made warranting reversal of his conviction, claims defendant, when his entire confession was admitted into evidence and read to the jury. After describing the sexual assault and murder in detail, defendant stated in his confession that he decided to murder another person, his mother's boyfriend:

"A. I was going to take care of some more busines[s]. I was going to kill somebody else who did something wrong to my mother.

* * * * * *

Q. Why did you go to 71st and Paulina?

A. Because I wanted some revenge to this person named Tracy Smith, who accidentally punched my mother in the mouth.

Q. Why did you go to do this at this time in the morning?

A. Because I felt bad about it, I had already done something dirty and said fuck it, I might as well finish it off."

But Smith had not been home. Defendant then told Croft to ditch the knife; Croft threw the knife into a garbage can. Afterwards, they drove to Croft's house and changed their clothes.

Before the confession was read, defense counsel moved for redaction of all statements regarding defendant's intention to kill Smith. The trial judge denied the motion, reasoning that it appeared that one defense theory would be that the confession was involuntary, the product of a police beating; this theory would be disproved by defendant's statement that he had intended to murder someone for reasons unrelated to Boyd's murder. When asked by the judge to reveal whether this theory would be raised, defense counsel refused to do so, arguing that the proper method would be to introduce the redacted confession during the prosecution's case; if the defense later raised this theory, the entire confession could then be introduced. The trial judge decided against using this procedure, admitting the entire confession into evidence during the prosecution's case. Later, after the defense had rested, the judge acknowledged that no evidence of the confession's involuntariness had been produced; still, the judge believed the portion of the confession quoted above was admissible "because it has to do with the defense theory that Mr. Henderson didn't commit the crime at all and it's probative of the issue as to how that would have arisen in the course of the statement being given if Mr. Henderson was not responsible for the crime and was indicating things that related to this crime. Why would there be other things in there?"

Defendant cites decisions of this court holding that evidence that a defendant has committed crimes other than the crime for which he is being tried is inadmissible if irrelevant to any material issue, such as criminal intent or identification, for such evidence serves only to persuade a jury that the defendant has a propensity to commit crimes....If a competent confession contains references to other crimes defendant has committed, those references have to be deleted before the confession is admitted into evidence unless the confession's evidentiary

value would be seriously impaired.... Defendant argues that this portion of his confession lacked any probative value but was highly prejudicial, for after the jury learned that he was willing to kill a man who had accidentally punched his mother, it would have concluded he had a propensity to murder, and so been overpersuaded that he had killed Boyd.

We agree with defendant; these statements were irrelevant and should have been redacted from his confession. We reject the State's arguments that these statements were relevant because they showed how and where defendant disposed of the murder weapon (the murder weapon was never found and the defense suggested throughout trial that the police investigation was sloppy and hurried) and because in saying he "had already done something dirty" and he "might as well finish it off" defendant revealed a consciousness that he was guilty of Boyd's murder .... The State's first relevancy argument is refuted by the fact that we were able to quote all of defendant's statements of intent to kill Smith without including his description of how the murder weapon was thrown away. As to the statements' relevancy to show consciousness of guilt, we first note the low probative value of defendant's statement that he "had already done something dirty," for, immediately before saying this, he had described in detail how he had sexually assaulted and murdered Boyd; we doubt the jury was any more convinced of defendant's guilt by hearing that, after murdering Boyd, he realized that what he had done was wrong. Furthermore, we have discovered that the confession could have been redacted in such a way as not only to include the statements showing consciousness of guilt while omitting the statements of defendant's intent to kill Smith, but also to avoid any awkwardness that would have indicated to the jury that the confession had been redacted (and thus possibly have caused the jury to doubt the confession's voluntariness).

Yet the trial court's error in admitting defendant's entire confession into evidence was not reversible error. At no other time during trial did the prosecutor again refer to defendant's intention to kill Smith or try to persuade the jury that defendant's desire to kill Smith increased the likelihood that he had murdered Boyd. These once-mentioned statements were also not significantly prejudicial in nature because defendant merely expressed an intent, never realized, to kill Smith, which is far less prejudicial than is an actual admission to another crime.... And these statements, viewed within the context of defendant's entire confession, do not manifest his possession of a propensity to murder before he murdered Boyd; rather, it appears he formed an intent to kill Smith only after, and in part because, he had murdered Boyd; thus, any propensity to murder was evidently created by his act of murdering Boyd. Finally, any prejudicial effect produced by these statements was overshadowed by the substantial evidence of defendant's guilt: his confession, corroborated by a police officer and assistant State's Attorney; Anthony Woodard's testimony describing the sexual assault and defendant's driving off with Boyd in the trunk of his car; and testimony by two others placing him and Boyd at the party on July 12-13. For these reasons, we conclude that the jury's

verdict of guilty did not result from the error of admitting the confession unredacted....

Defendant also believes he was deprived of a fair trial by the prosecutor's evocation of inadmissible testimony indirectly disclosing that Anthony had made prior statements to the police consistent with his trial testimony. On direct examination, Anthony testified that the only reason his brother Alonzo and Campbell had sexually assaulted Boyd, and the only reason Anthony did not try to physically stop the assault or flee and get help, was that defendant and Croft had held knives on them. Defense counsel's cross-examination impeached Anthony's credibility by establishing that he wanted to help his brother, whom he loved, and Campbell, who was like a cousin to him (Alonzo and Campbell were also on trial for the sexual assault, kidnaping, and murder of Boyd). Then, on redirect, the prosecutor asked, "Anthony, did you tell the police officers that night essentially the same thing that [you're] telling the ladies and gentlemen of the jury?" to which Anthony answered, after defense counsel's objection was overruled, "Yes, something like that."

Evidence of a prior consistent statement is inadmissible hearsay unless it has been suggested that a witness recently fabricated testimony or has a motive to testify falsely and the prior statement was made before the motive arose.... Defendant argues that in this case the exception to the rule that prior consistent statements are inadmissible does not apply, for while defense counsel's cross-examination suggested Anthony had a motive to lie--in order to exonerate his brother and Campbell by putting all the blame on defendant and Croft--at the time Anthony talked to the police on July 17 he would have had the same motive--he would have wanted to protect his brother and Campbell then, too.

Defendant is correct; there is no doubt that the prosecutor erred in asking a question formulated to elicit testimony from Anthony that he had made a prior consistent statement, and there is no doubt that the trial court erred in admitting this testimony. Anthony's motive to lie to protect his brother and Campbell would have existed when he talked to the police as well as when he testified--at neither time would he have wanted to implicate them. We note also that defense counsel suggested Anthony might have lied in order to protect himself from criminal prosecution; but this motive to lie would also have existed both on July 17 and at the time of trial.

As defendant recognizes, however, the fact that this was error is not enough because the error was waived when defendant failed to include it in his post-trial motion.... Defendant therefore urges us either to recognize it as plain error (107 Ill.2d R. 615(a)) or to find that defense counsel's failure to include this issue in the post-trial motion constituted ineffective assistance of counsel, denying defendant his sixth amendment right to counsel (Strickland v. Washington (1984), 466 U.S. 668, 104 S. CT. 2052, 80 L. ED.2d 674;... U.S. Const., amend. VI). We decline to do so.

The plain error doctrine provides that a court of review may notice waived errors if either the evidence is closely balanced or "the error is so fundamental and of such magnitude that the accused was denied a fair trial" and remedying the error is "necessary to preserve the integrity of the judicial process." ... As we have already stated, the evidence in this case was not closely balanced. Nor do we find that defendant was denied a fair trial as a result of this portion of Anthony's testimony. The prejudicial nature of evidence of prior consistent statements is judged on a case-by-case basis. Admittedly, it is possible the jury saw Anthony as more credible because he said he had given the police the same account four days after the murder, and people are more apt to believe what is repeated.... But the prejudicial effect of this testimony was minimized by the fact that, unlike some cases relied upon by defendant where one witness corroborated another's testimony by testifying that the other made a prior consistent statement, here Anthony himself provided the evidence of his own prior consistent statement, and so his credibility was not truly enhanced; in other words, the jury would not have been inclined to attribute a great deal more credibility to Anthony's testimony because he had corroborated himself.... Other circumstances also minimize the prejudiciality of this testimony: The testimony was general, not specific, in that Anthony said he told the police "something like" what he had testified to; no portion of Anthony's statement to the police was admitted into evidence ...; and at no other time during the trial was there a reference, general or specific, to what Anthony told the police.

See 142 Ill.2d at 305-12, 568 N.E.2d at 1257-60, 154 Ill. Dec. at 805-11.

The Illinois Supreme Court also concluded that the prosecutor's comments were improper, but did not deprive Petitioner of a fair trial.

Defendant also contends that comments the prosecutor made during his closing and rebuttal arguments were so improper as to have denied him a fair trial. Defendant categorizes these comments as appeals for sympathy for Boyd and references to her family, and comments explaining why the prosecution had not presented certain scientific evidence.
Among the comments defendant criticizes are the following:
"There is something about this that rips at my gut. [Objection sustained.]
*　*　*　*　*　*
*　*　* [H]ave you ever had the opportunity to sit with a loved one as they are laying in a hospital bed gasping for their last breath * * *?
*　*　*　*　*　*
Imagine what was going through that young girl's mind when she had to sit laying in that alley looking at the front of that car beating down on her at 35 miles an hour, being struck by the bumper, dragged on the pavement. She was still alive.

\*   \*   \*   \*   \*   \*

He talks about his rights. What about her rights? Did he ask Kim Boyd prior to taking a knife and plunging it in her head and in her neck, in her butt, in her legs, 'Do you want to talk to your mom before I kill you?' * * * Did he have the compassion to say, 'Do you want to complete high school * * * do you want to get married and have children and have a life with a family * * * ?' "

Clearly these comments were improper and were attempts to inflame the jurors' emotions and engender feelings of sympathy for Boyd and her family, causing some prejudice to defendant.... Some also improperly expressed the prosecutor's feelings and invited the jurors to put themselves in Boyd's place. Yet these comments were not so improper as to warrant reversal of the convictions. The first comment quoted was properly dealt with when the trial court sustained a defense objection. As to the other comments, defendant failed to object to them at trial, and his post-trial motion refers to them in only general terms as remarks made by the prosecutor that cumulatively denied him a fair trial. Thus, defendant has waived any error in relation to them.... Owing to this waiver, we will only notice the prosecutor's comments if they were so improper that their toleration constituted plain error (107 Ill.2d R. 615(a)). This is not the case, for they did not cause substantial injustice to defendant...; these comments did not effectively deprive defendant of a fair trial because the evidence of his guilt was substantial and was not closely balanced....

Moreover, even if defendant had not waived these errors we would find reversal to be unwarranted, for the standard of review applied to arguments by counsel is similar to the standard used in deciding if a plain error was made; attorneys are allowed some latitude in closing arguments, and comments constitute reversible error only when they engender substantial prejudice against a defendant ..., such that it is impossible to say whether or not a verdict of guilt resulted from those comments. Here, the evidence of defendant's guilt was substantial enough that we conclude the jury would have returned a verdict of guilty even if the prosecutor had not made these comments....

The other allegedly improper comments by the prosecutor dealt with the fact, noted by defense counsel in his closing argument, that the prosecution had not presented any evidence that the police had found fingerprints linking defendant to the murder. In rebuttal closing argument, this exchange occurred:

"[ASSISTANT STATE'S ATTORNEY]: Prints. Did he [Mr. Linn, defense attorney]
bring anybody in here? Did you hear any evidence at all about how difficult it is to raise a print?

MR. LINN: Objection.

THE COURT: Overruled.

[ASSISTANT STATE'S ATTORNEY]: Did you hear any evidence, anybody get up on the stand and say, 'Hey, different surfaces leave different prints'? People

don't usually leave prints. People who are sweating make certain or aren't able to leave prints.

Anything like that? Call somebody in like an expert?"

A defense objection to the last comments was sustained, but the jury was not instructed to disregard them. (Defendant also complains of the prosecutor's comments suggesting that the reason the prosecution did not introduce results of analyses of swabs taken from Boyd's body was that such analyses would have been useless because the body was not examined for more than a day after it was found; defendant waived this alleged error by not objecting to it at trial, and we find that these comments did not constitute plain error because this suggestion was vague, there was substantial evidence of defendant's guilt, and the trial court told the jury that closing arguments are not evidence.)

According to defendant, because no evidence at trial supported the prosecutor's proposed reasons for the prosecution's failure to introduce fingerprint evidence (it can be difficult to raise a fingerprint, and sometimes a person does not leave fingerprints), these comments were improper. In opposition, the State says these comments were fair response to two of the defense's arguments in closing: that the police should have looked for fingerprints at Croft's house and their failure to do so showed how they rushed to close this case of black boys killing a black girl as soon as defendant confessed; and that the jury should not convict defendant in the absence of physical evidence linking him to the murder.

Defendant is correct; the comments regarding reasons for the absence of fingerprint evidence were blatantly improper. However, the statement regarding defendant's failure to present a witness to testify to the process of raising a fingerprint was not error.... It is a fundamental principle of trial practice that an attorney's argument is to be based on the evidence and reasonable inferences drawn from the evidence....; United States ex rel. Shaw v. De Robertis (7th Cir.1985), 755 F.2d 1279 (defendant was denied fair trial by prosecutor's telling jurors they could not see police report because it was hearsay evidence, but if they could they would see truth, for comment insinuated that police report contained facts implicating defendant).) By the time an assistant State's Attorney, sworn to uphold justice for all of society, including a defendant, has reached the stage in his career when he is prosecuting a capital murder case this principle should have become deeply ingrained in his code of trial conduct. Indeed, we expect jurors to follow a judge's instruction, possibly given only once during trial, that what attorneys say during argument is not evidence and that their verdict should rest on their own understanding of the evidence. We cannot expect less of prosecutors than that they abide by such a fundamental principle. Here the assistant State's Attorney, by ignoring this principle, created a risk that the jurors would be misled and confused and, because he appeared to have knowledge of fingerprint evidence superior to their own, would consider as evidence the reasons he proposed to explain the lack of fingerprint evidence. Another effect of these comments, as

damaging as suggesting reasons fingerprints may not have been found without presenting any evidence of the scientific soundness of these reasons or their application to this case, was their inherent implication that the police in fact looked for fingerprints but did not find any, conduct which was not proved.

Despite the prosecutor's misconduct in making these comments, we do not think they served to deny defendant a fair trial, either alone or in combination with the comments referring to Boyd's thoughts, rights, and family. The trial court sustained defense objections to comments that were improper. Also, the trial court instructed the jurors, prior to closing arguments and at the end of trial, that closing arguments are supposed to be confined to the evidence and the inferences that can reasonably be drawn from the evidence, and they should disregard statements not so based. These circumstances, along with the substantial evidence of defendant's guilt, lead us to conclude that these improper comments do not warrant reversal of defendant's convictions.

See 142 Ill.2d at 321-26, 568 N.E.2d at 1264-66, 154 Ill. Dec. at 815-18.

Justice Clark vigorously dissented, maintaining that the cumulative effect of these errors was to deprive the Petitioner of a fair trial.[9]

---

[9] "As the majority recognizes, numerous evidentiary errors were made at defendant's trial. For example, the majority finds that certain statements relating to defendant's intent to commit an unrelated crime should have been redacted from defendant's confession before it was read to the jury ...; that the State improperly asked questions formulated to elicit testimony of a prior consistent statement from one of the State's key witnesses...; that the prosecutor made numerous improper statements in his closing argument intended to "inflame the jurors' emotions and engender feelings of sympathy for [the victim] and her family, causing some prejudice to defendant" ...; and that the prosecutor made improper statements regarding the absence of fingerprint evidence which would tie defendant to the crime ....

In considering each of these errors individually, the majority concludes that none of them warrant reversal. The majority's basis for this conclusion is that some of the errors made at trial were waived by defendant's failure to raise them in his post-trial motion, and others were harmless due to the overwhelming evidence of defendant's guilt. I agree that when considered individually, none of the errors warrant reversal. However, I believe that the cumulative effect of these errors has deprived defendant of his constitutional right to a fair trial. This court has frequently reversed convictions and sentences where there were errors which cumulatively served to deprive the defendant of due process...." See 142 Ill.2d at 348-9, 568 NE.2d at 1277, 154 Ill. Dec. at 828.

### 3. Analysis

The Petitioner emphasizes the state court dissent; however, whether the dissent had the better view is not really the issue under the new standard. *See Sanchez*, 189 F.3d at 624-25. That the trial was somewhat sloppy is also evident, but that does not necessarily yield much for the Petitioner. "[T]hat we may think certain things could have been handled better by the state trial judge or by the prosecuting attorney or by the state reviewing court means very little." *Id.* at 623.

This court concludes that Petitioner's cumulative trial error claim was procedurally defaulted by his failure to raise it before the Illinois Supreme Court. A review of Petitioner's brief on direct appeal shows that the two evidentiary issues (the unredacted confession and testimony about prior consistent statements) were raised as individual challenges, separate from each other and the prosecutorial misconduct claims. Further, Petitioner's reliance on *County Court of Ulster v. Allen*, 442 U.S. 140 (1979), appears misplaced, as the Court looked to the dissent as *one* factor in determining whether an issue was ruled upon on the merits. In this case, it is all the Petitioner has, as the majority opinion plainly did not consider a cumulative error claim. Obviously, given the number of claimed errors, the Petitioner was free to raise the issue or the state court to consider it *sua sponte*, but neither chose to do so. In addition, Petitioner cannot establish cause and prejudice or actual innocence to excuse this default. Moreover, we note that even if the claim had not been defaulted it would fail on the merits.

The Illinois Supreme Court did not cite *Augenblick* nor *Darden* or *DeChristoforo* in its opinion. Nonetheless, in evaluating most of the claims under a plain error standard, which focused upon whether the Petitioner was deprived of a fair trial, its analysis was not significantly at odds with the Supreme Court's formulations.

As to the evidentiary challenges themselves, while neither would have occurred in a "perfect trial," they neither singly or together amount to a cognizable claim. These rulings did not render the trial fundamentally unfair nor did they result in the conviction of an individual who was likely innocent. The isolated reference to another crime and the state's witness' "self-vouching" were inconsequential in light of the weighty evidence of Petitioner's guilt. Further, the reference to the other crime was of a plan to commit another crime rather than another actual offense. This brief reference, coming after a lengthy confession of a brutal homicide, was unlikely to have a significant impact on the jury. *See generally Jones v. Page*, 76 F.3d 831, 855 (7th Cir.), *cert. denied*, 519 U.S. 951 (1996).

As to the prosecutorial misconduct challenge, we, like the Illinois Supreme Court, were troubled by the prosecutor's comments. We must note, however, that the prosecutor's actions were not significantly worse than those of the prosecutors in *Darden* and *Hennon v. Cooper*, 109 F.3d 330 (7th Cir. 1997), *cert. denied*, 522 U.S. 819 (1997) (AEDPA case). In *Darden*, the prosecutor's comments included: (1) that he was convinced of defendant's guilt; (2) that if he was the defendant facing the death penalty, he would lie to get out of it; (3) that the defendant was an animal; (4) that the victim should have blown the defendant's face off with a shotgun; (5) that the prosecutor would like to see the defendant with a blown off face; (6) that the defendant should kill himself; and (7) that it was unlucky for everyone that the defendant was not killed in his car accident. 477 U.S. at 180-1, 191. In *Hennon*, the prosecutor stated: (1) that passengers in drive-by murders "get convicted all the time"; (2) that accountability is like "a steel ball and anybody that helped the ball go down the ramp" should be guilty of murder; (3) that defense counsel wants to "put barriers in front of you [the jury]"; (4) that "when you put a witness on the stand you're

vouching for his credibility"; (5) that defendant had a right to waive a jury and have the judge decide the case; (6) that gangs operate like "wolf packs"; and (7) "your verdicts will decide the type of conduct that you're going to tolerate on the streets of our city." 109 F.3d at 332-3. Neither *Darden* nor *Hennon* resulted in the granting of habeas relief. Again, given the weight of evidence–which included the Petitioner's lengthy confession–the prosecutor's comments did not render the trial fundamentally unfair. In sum, while this court is given some pause by some of the sloppiness in the Petitioner's trial, we cannot conclude that there is anything objectively unreasonable about the state court's analysis of the relevant issues.

## D. Trial Judge's Failure to Consider Mitigating Evidence

Petitioner maintains that the trial judge deprived him of a fair and reliable death penalty hearing by refusing to consider the mitigating evidence of Petitioner's traumatic childhood and turbulent family history. Petitioner emphasizes that the trial judge incorrectly concluded that such evidence was not mitigating as a matter of law. Respondent maintains that the issue was procedurally defaulted, or, alternatively, that the trial judge was free to construe the evidence as aggravating rather than mitigating.

### 1. Legal Standard

The Eighth Amendment requires an individualized sentencing determination in death penalty cases. *Stringer v. Black*, 503 U.S. 222, 230 (1992). The sentencer in a capital case "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence...." *Weeks*, 120 S. Ct. at 732. *See also Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). "If the sentencer is to make an individualized assessment of the appropriateness

of the death penalty,' evidence about the defendant's background and character is relevant because of the belief, long held by society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987)). However, some mitigating factors, such a history of abuse by family members and mental conditions, can be two-edged swords--they may reduce the blameworthiness for the crime even as they indicate that the defendant may be dangerous in the future. *Id.* at 324.

## 2. State Court Decision

The Illinois Supreme Court unequivocally rejected Petitioner's challenge on direct appeal.

> Next, defendant earnestly argues that the trial judge wrongly judged the significance of evidence of defendant's "traumatic childhood and turbulent family history" and how "to a substantial extent, he is the involuntary product of an extremely violent and dysfunctional family environment," involuntary because he did not choose his relatives and his upbringing. At the sentencing hearing, defendant introduced the testimony of a social worker, Ms. Dinguss, and a psychosocial evaluation of defendant she had prepared. In brief, this evidence revealed: Defendant, an only child, was raised by his mother, his father having been shot and killed by his mother's uncle before defendant reached his first birthday; this same uncle was shot and killed by his own wife; defendant's grandfather committed suicide; defendant's mother was sexually promiscuous throughout his childhood, a situation he resented, and defendant had been abused by men; his mother had also been molested to some degree by her father and uncle; defendant said his female cousins had molested him; as for defendant's past behavior, he had been involved in gangs, had hit women with his hands and hit the mother of one of his many children with a wrench, and had shot at a woman on a public street. Although defendant had never been physically abused, in Ms. Dinguss' opinion he had been emotionally abused by his mother's conduct and criticism of him, and had suffered some "psychological trauma" from his upbringing in a family situation that was, as a whole, "severely dysfunctional." Ms. Dinguss also stated that, owing to limited information, she was not able to determine the extent of this psychological trauma; yet she concluded that

defendant's violent impulses would escalate unless he received "long-term intensive psychotherapeutic intervention."

Before sentencing defendant, the trial judge stated those facts he had considered and the conclusions he had made about defendant's character as a whole and about defendant's demeanor and motivations on the night of July 12-13, 1986. At this time, the trial judge commented on the evidence defendant submitted about his upbringing and its effect on the type of person he was:

"[T]here has been testimony from Miss Dinguss relative to the fact that she believes that it was inevitable in the Defendant's life that this act of outrageous violence would occur because of the Defendant's upbringing. A mitigating factor is not that it is inevitable that the Defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again.

There has been no testimony to that, in fact to the contrary, the testimony has been that the Defendant acts out his violence towards women, the young, the unprotected, he acts out toward them because of the relationship with the family. Whether that is true or whether it is not true it is not a mitigating factor to be determined that the Defendant can be released into society to perform good works, rather it shows me that based on the acts in this case, that the Defendant will act out his aggression violently and outrageously just as was done here."

Defendant argues that these remarks show that the trial judge did not understand that mitigating evidence can include evidence that a defendant was not fully culpable and responsible for his acts owing to his upbringing and does not encompass only evidence showing a defendant to be a good person who will do good works in the future. Because the evidence of his upbringing lessened his culpability for the horrendous crimes he committed, defendant contends the judge deprived him of a fair and reliable capital sentencing hearing under the eighth amendment ( U.S. Const., amend. VIII) when the judge refused to see that this evidence was mitigating in any way, and instead considered it as aggravating solely, reasoning that it showed defendant had a violent nature and failed to show he could ever be rehabilitated so as not to pose a danger to society. As support, defendant contends that the Supreme Court has held that when a sentencer is deciding whether to sentence a defendant to death and is presented with evidence of the defendant's traumatic childhood, the sentencer has to consider it as mitigating. Defendant, not content merely to argue that this judge erred in finding evidence of his upbringing to be aggravating and not mitigating, further asserts that evidence of a defendant's traumatic childhood, during which he suffered emotional abuse, is comparable to evidence of mental illness and, thus, is inherently mitigating and can never be considered aggravating. Defendant believes "[i]f these conditions also make it likely that the defendant may act violently, that is simply not his fault and can't be considered a reason to impose the death penalty upon him."

Despite defendant's attempts to find support for the rule he proposes, he fails to prove that the Court has ever held that a sentencer invariably has to give mitigating weight to evidence of a defendant's troubled childhood and can never assign it aggravating weight. It is true that, in general, " 'punishment should be directly related to the personal culpability of the criminal defendant.' " (Thompson v. Oklahoma (1988), 487 U.S. 815, 834, 108 S. CT. 2687, 2698, 101 L. ED.2d 702, 717, quoting California v. Brown (1987), 479 U.S. 538, 545, 107 S. CT. 837, 841, 93 L. ED.2d 934, 942.) But the Court's pronouncements about the significance of mitigating evidence introduced by a defendant have declared merely that, when such evidence is relevant, a sentencer can neither refuse to consider it (Eddings v. Oklahoma (1982), 455 U.S. 104, 102 S. CT. 869, 71 L. ED.2d 1) nor be precluded from considering it (as occurs when a judge instructs a sentencing jury that it can consider only evidence satisfying a limited list of mitigating factors) (Hitchcock v. Dugger (1987), 481 U.S. 393, 107 S. CT. 1821, 95 L. ED.2d 347). Defendant endeavors to persuade us that, because the Court has said a sentencer cannot refuse to consider relevant mitigating evidence presented by a defendant, it has held that a sentencer must give it some mitigating weight. We disagree with the conclusion. The Court has held only that when the sentencer is a judge, the sentencer cannot refuse to hear evidence introduced as mitigating, and cannot refuse to consider whether that evidence is in fact mitigating on the basis that the sentencing judge believes the evidence is barred by law from being considered as mitigating. This was the case in Eddings : The sentencing judge believed that he could not consider evidence of defendant's troubled youth, during which he had little parental supervision and was severely beaten by his father, causing defendant to become emotionally disturbed, slightly retarded, and sociopathic, because it did not fall under any of the mitigating factors listed in the statute. The Court elucidated the sentencing judge's error: "[I]t is clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that as a matter of law he was unable even to consider the evidence." (Emphasis in original.) Eddings, 455 U.S. at 113, 102 S. CT. at 876, 71 L. ED.2d at 10.

Contrary to defendant's argument, the Court has indicated that evidence of an upbringing which has caused a defendant to become violent and aggressive can be considered in aggravation, for one duty a sentencer has is to predict a defendant's future behavior based on his past behavior. (Skipper v. South Carolina (1986), 476 U.S. 1, 5, 106 S. CT. 1669, 1671, 90 L. ED.2d 1, 7.) In Burger v. Kemp (1987), 483 U.S. 776, 793-94, 107 S. CT. 3114, 3125-26, 97 L. ED.2d 638, 656-57, the Court held that defense counsel had not acted ineffectively by failing to introduce evidence of the defendant's troubled background at the sentencing hearing; while the sentencing jury might have been sympathetic, it also might have thought the defendant was nonetheless responsible for the criminal conduct engendered by his violent nature and that his violent nature made him a

danger to society--" ' "mitigation, after all, [m]ay be in the eye of the beholder [citations]." ' "

Defendant is also mistaken about the holding in Penry v. Lynaugh (1989), 492 U.S. 302, 109 S. CT. 2934, 106 L. ED.2d 256. Penry did not hold that a sentencer has to consider evidence of a troubled childhood in mitigation because it always reduces a defendant's culpability, and that it is improper to consider such evidence's aggravating implication that a defendant may be dangerous in the future. In Penry, there was evidence that the defendant was moderately retarded and unable to learn from his mistakes, and, as a child, had been beaten about the head by his mother. Although the trial judge admitted this evidence, the judge did not instruct the sentencing jury that it might be considered as mitigating. Rather, the jury was instructed that, before deciding whether to sentence the defendant to death, it had to answer three questions affirmatively, as required by the Texas death penalty statute; while no question asked about mitigation, in arriving at an affirmative answer to one question, whether the defendant would be a continuing threat to society, the jury might have actually assigned a negative value to the evidence of defendant's retardation and upbringing. The Court held that the trial judge had erred by failing to instruct the jury that, besides answering these three questions, it could give effect to any mitigating value possessed by the evidence of defendant's background. Even so, in characterizing this evidence the court recognized that "Penry's mental retardation and history of abuse is thus a two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that there is a probability that he will be dangerous in the future." (Penry, 492 U.S. at 307-311, 319-20, 324, 329, 109 S. CT. at 2941-42, 2947, 2949, 2952, 106 L. ED.2d at 271-72, 279, 281-82, 284.) The Court did not state either that this evidence was inherently mitigating and the sentencer was required to consider it as such, or that it would be improper to consider this evidence in aggravation as it indicated the defendant had an unrehabilitable violent nature. Rather, the error was that the jury instructions allowed the jury to consider only one edge of this two-edged sword.

Analyzing the quoted comments of the trial judge in the present case, along with other comments he made before sentencing defendant, we conclude that the judge acted within his discretion in finding that the evidence of defendant's family history was not such that it mitigated his conduct in raping and murdering Boyd. (See People v. Christiansen (1987), 116 Ill.2d 96, 122, 107 Ill.Dec. 198, 506 N.E.2d 1253 (supreme court will not lightly overturn trial court's findings made during aggravation and mitigation phase of death penalty hearing).) As a whole, the trial judge's comments reveal that he saw defendant as a young man who had coldly, and over the course of several hours, committed these horrendous acts, which were typical of his violent nature toward young women, and who could not be rehabilitated and so would remain a dangerous and violent person. The trial judge believed defendant deserved to be sentenced to death. The quoted comments do not show that the trial judge believed he was somehow precluded

from viewing the evidence of defendant's background as mitigating; rather, the trial judge admitted this evidence, considered what it revealed about defendant, and concluded that it simply had no mitigating value but was actually aggravating. As we explained, the Court has never held that a sentencer is required to give mitigating weight to such evidence, and we find that the trial judge did not err in his evaluation of this evidence.

*See* 142 Ill.2d at 334-41, 568 N.E.2d at 1271-3, 154 Ill. Dec. at 822-24.

### 3. Analysis

We note at the outset that the Illinois Supreme Court cited the appropriate Supreme Court cases in its analysis. Moreover, a review of the state trial judge's decision persuades us that the Petitioner's claim is baseless.[10]

At the start, the trial judge stated that all circumstances were to be considered in sentencing the Petitioner. (State Criminal Trial Record at pp. 2377.) The trial judge then covered each of the statutory mitigating factors, including evidence of prior criminal activity (State Criminal Trial Record at pp. 2377), whether Petitioner was under some extreme mental or emotional disturbance (State Criminal Trial Record at 2379, 2382), whether the victim was a participant (State Criminal Trial Record at pp. 2380), whether Petitioner's actions were coerced (State Criminal Trial Record at pp. 2381), and whether Petitioner was present at the homicide (State Criminal Trial Record at pp. 2384). The trial judge also explicitly referred to Petitioner's family life and background as presented by Ms. Dinguss. (*See, e.g.,* State Criminal Trial Record at pp. 2380, 2383.)

As did the Illinois Supreme Court, we do not believe the trial judge's statements indicate that he believed that he was foreclosed from considering the Petitioner's evidence. There is no

---

[10] The claim was addressed on the merits by the Illinois Supreme Court, so it was not procedurally defaulted.

doubt the trial judge considered Petitioner's family life. Petitioner, at bottom, is complaining that the trial judge did not believe it was sufficiently mitigating to prevent the imposition of the death penalty.

Unfortunately for Petitioner, there's nothing legally improper or, for that matter, even surprising, about a judge or jury interpreting evidence offered in "mitigation" as evidence of future dangerousness (or inability to be rehabilitated), and therefore "aggravating." The sentencer "may not be impressed with the idea that to know the cause of viciousness is to excuse it; they may conclude instead that, when violent behavior appears to be outside the defendant's power of control, capital punishment is appropriate to incapacitate." *Burris v. Parke*, 130 F.3d 782, 784-85 (7th Cir. 1997). *See also Britz v. Cowan*, 192 F.3d 1101, 1104 (7th Cir. 1999), *cert. denied*, 120 S. Ct. 1274 (2000) ("People with his background of antisocial behavior are more likely to commit murders than other people, but this does not make them attractive candidates for lenity; rather, it underscores their dangerousness"). There is nothing unreasonable about the Illinois Supreme Court's analysis of this issue.

## E. Trial Judge's Use of Mitigation Standard in Sentencing

Petitioner argues that the trial judge violated his rights under both the 8th and 14th Amendments by basing his decision to impose the death penalty solely on his belief that the Petitioner could not be rehabilitated. In particular, Petitioner maintains that the trial judge violated his rights by using such a vague and arbitrary standard and for not providing adequate notice that he would use the standard. Respondent argues that the claim is both procedurally defaulted and meritless, as the state judge did not use a "rehabilitation" standard, and the Supreme

Court has never held that considering the likelihood of rehabilitation was improper in a death penalty case.

## 1. Legal Standard

It is axiomatic that "[n]otice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure." *Lankford v. Idaho*, 500 U.S. 110, 126 (1991). Moreover, a capital sentencing system must provide a meaningful basis for distinguishing those cases in which the death penalty is imposed versus the majority of cases in which death is not imposed. *Godfrey v. Georgia*, 446 U.S. 420, 427(1980). The capital sentencing system "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a death sentence.'" *Id* at 428 (internal cites omitted)(vague standards not permissible). Considering whether a defendant is likely to pose a continuing danger to society in deciding whether to impose a death sentence is not unconstitutional. *Jurek v. Texas*, 428 U.S. 262, 272-76 (1976). *See also Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) ("Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing..."). Evidence that a defendant would pose a future danger if not executed is an appropriate aggravating factor; conversely, evidence of the lack of future danger is a potential mitigating factor. *Skipper*, 476 U.S. at 5.

## 2. State Court Decision

The Illinois Supreme Court rejected this post-conviction claim.

With respect to defendant's argument regarding the trial judge's basis for imposing the death penalty, defendant contends that the trial judge refused to consider evidence which he presented during the aggravation and mitigation phase

of the sentencing hearing. Instead, defendant contends that the judge focused exclusively on defendant's alleged inability to be rehabilitated and, further, that this was the judge's sole basis for imposing the death penalty. Defendant bases these contentions primarily on two comments made by the trial judge near the end of sentencing. In response to evidence that defendant's violent and dysfunctional upbringing made criminal action on his part essentially inevitable, the judge noted that "[a] mitigating factor is not that it is inevitable that the defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again." Later, the judge also stated: "I don't think that Mr. Henderson is a person that I believe can be rehabilitated."

Defendant asserts that the trial judge's "rehabilitative potential" standard is vague and arbitrary, both facially and as applied, and that it was imposed upon him in violation of his constitutional rights under the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). He asserts further that this standard was imposed without proper notice, and that if he had known the trial judge's sole focus was to be on his potential for rehabilitation, he could have prepared substantial evidence in mitigation. In response, the State maintains that defendant's argument is barred by principles of waiver and res judicata.

Initially, we note that defendant's "rehabilitative potential" argument was not squarely addressed in the direct appeal. In that appeal, defendant argued that the trial judge improperly considered the testimony given by a social worker during sentencing in aggravation, when the judge should have considered it in mitigation. The trial judge stated that the social worker's testimony, describing the defendant's violent and dysfunctional family history, caused him to believe that defendant could not be rehabilitated and would remain a danger to society. This court held that it was within the trial judge's discretion to consider the social worker's testimony in aggravation, and that the judge was not required to consider the family history of the defendant solely as mitigation evidence.... This court made additional comments concerning the trial judge's basis for imposing the death penalty, but the holding of the court on this issue was limited to the determination that the "trial judge did not err in his evaluation of [the social worker's] evidence." Henderson, 142 Ill.2d at 341, 154 Ill.Dec. 785, 568 N.E.2d 1234.

However, while we agree that defendant's "rehabilitative potential" argument has not been previously considered by this court, we must conclude that the argument has been technically waived. Under the general rule, in a post-conviction proceeding, an issue is deemed waived when it could have been presented on direct appeal but was not.... In the case at bar, defendant's "rehabilitative potential" argument is focused almost entirely on the statements and actions of the trial judge during the sentencing hearing, matters which were part of the trial record. Hence, defendant could have raised the "rehabilitative potential" argument on direct appeal, but chose not to.

In response, defendant points out that among the many exhibits attached to the post-conviction petition are copies of decisions from other capital cases presided over by the same judge who had sentenced defendant to death. In some of those cases, the judge had considered the respective defendant's potential for rehabilitation, while in others he had not. Defendant argues that these cases are evidence of the vague and arbitrary nature of the judge's "rehabilitative potential" standard and that, because these cases were not part of the record on direct appeal, his argument is not waived.... We disagree. It is well established that courts may take judicial notice of matters which are commonly known or, if not commonly known, are readily verifiable from sources of indisputable accuracy.... The cases defendant offered with his post-conviction petition are public documents which fall within the category of readily verifiable matters.... If essential to his argument, defendant faced no bar in presenting these additional cases on direct appeal.

Furthermore, even assuming, arguendo, that defendant's "rehabilitative potential" argument has not been waived, it is nevertheless unsupported by the facts or by law. The underlying premise of defendant's argument--that his inability to be rehabilitated was the sole criterion used by the trial judge in imposing the death penalty--is unsupported by the facts before this court. A review of the record indicates that the trial judge plainly considered other factors in addition to the defendant's potential for rehabilitation when the court determined that defendant deserved the death penalty. Indeed, after hearing the evidence offered at sentencing, the trial judge explicitly recited and applied the statutory list of mitigating factors. Ill.Rev.Stat.1985, ch. 38, par. 9-1(c).

The judge took note of whether a lack of a prior history of criminal activity could mitigate against imposing the death penalty. (Ill.Rev.Stat.1985, ch. 38, par. 9-1(c)(1).) The judge noted that defendant had struck a woman who attempted to retrieve a videotape from his apartment and, in a separate incident, had shot at her in a car. The judge also noted that defendant had struck his girlfriend and mother of his child in the head with a wrench, injuring her to the extent that she required hospitalization. Based on this evidence, the judge concluded that there was, in fact, "a significant history of prior criminal activity on behalf of Mr. Henderson."

The trial judge also determined that defendant was not under the influence of extreme mental or emotional disturbance (Ill.Rev.Stat.1985, ch. 38, par. 9-1(c)(2)) and, further, that the victim was not a participant in the defendant's homicidal conduct and did not consent to the homicidal act (Ill.Rev.Stat.1985, ch. 38, par. 9-1(c)(3)). In considering whether defendant acted under the compulsion of a threat of imminent infliction of death or great bodily harm when he committed his crimes (Ill.Rev.Stat.1985, ch. 38, par. 9-1(c)(4)), the judge noted,

"There is no such evidence here, in fact, not only was Mr. Henderson not compelled to do as he did, but he took the time to contemplate and reflect about what his acts would be while the girl was in the trunk of the car and while he rode around to decide what type of violence he would perpetrate upon her.

As difficult as it was for me to understand at the time that I heard the evidence, but I heard it again and reviewed the transcript, with Kim Boyd locked and blindfolded and bound in the trunk of the car, he stops his automobile in a neighborhood he was familiar with to give a jump to another friend's car that couldn't be started, he was so overwrought, apparently, as he would like to say, with this quick action and this passionate reaction of violence that he took the time to use his mechanical skills to aid a friend.

I find that is not mitigating in the least, I find it aggravating, and I find that it shows me that Mr. Henderson is a cold and calculating and uncaring individual who has taken this life with planning."

Finally, the trial judge noted that defendant was personally present during the commission of the murder. Ill.Rev.Stat.1985, ch. 38, par. 9- 1(c)(3).

Summarizing, the record is clear that more was considered at sentencing than defendant's ability to be rehabilitated. The judge considered both the aggravating and mitigating evidence presented and made an "individualized determination on the basis of the character of the individual and the circumstances of the crime" (emphasis omitted) (Zant v. Stephens (1983), 462 U.S. 862, 879, 103 S. CT. 2733, 2743-44, 77 L. ED.2d 235, 251) that defendant deserved the death penalty.

The lack of factual support for defendant's "rehabilitative potential" argument is paralleled by a lack of sound legal support. Defendant argues that the "[t]he rehabilitative standard is vague on its face" because it is unclear under such a standard whether the sentencer is required to consider the potential that the defendant can be rehabilitated to useful citizenship in society, a "higher" standard, or whether the sentencer can consider that the defendant can be sufficiently rehabilitated to exist in a prison setting, a "lower" standard. We find no support for this proposition.

First, we note that there is no basis for concluding, as a matter of law, that there are "higher" and "lower" standards of rehabilitation. As the State correctly points out, incarceration need not presuppose continued criminality. To adopt defendant's argument on this issue would necessitate excluding the possibility that one may follow the precepts of accepted behavior while remaining in prison....

In addition, there is nothing inherently vague about considering, as a factor in sentencing, a defendant's potential for rehabilitation. (Jurek v. Texas (1976), 428 U.S. 262, 274-76, 96 S. CT. 2950, 2957-58, 49 L. ED.2d 929, 940-41 (opinion of Stevens, J., joined by Stewart and Powell, JJ.). Even though future behavior may not be easy to predict, "[t]he fact that such a determination is difficult, however, does not mean that it cannot be made." (Jurek, 428 U.S. at 274-75, 96 S. CT. at 2957, 49 L. ED.2d at 940.) Indeed, "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process ." Tuilaepa v. California (1994), 512 U.S. 967, ----, 114 S. CT. 2630, 2637, 129 L. ED.2d 750, 762.

Defendant argues further that the trial judge's "rehabilitative potential" standard is unconstitutional because of its arbitrary application. In support, defendant points to decisions from other capital cases presided over by the same judge who sentenced defendant in the case at bar to death. In some of those cases, the judge had considered the respective defendant's potential for rehabilitation, while in others he had not.

As a general matter, it is well established that a trial court has discretion to consider virtually all relevant evidence during sentencing. As this court has noted, "[i]n determining the appropriate sentence, the trial judge is to consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding. ... As a general proposition, any evidence regarding the defendant's character is relevant and admissible.... In capital cases, the trial court is constitutionally required under the eighth amendment to consider the character and record of the defendant and the circumstances of the offense so that the defendant receives a truly individualized sentencing. (Woodson v. North Carolina (1976), 428 U.S. 280, 303-04, 96 S. CT. 2978, 2991, 49 L. ED.2d 944, 961.) Moreover, because of the constitutional requirement of individualized sentencing, the sentencer may be given " 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.' " Tuilaepa, 512 U.S. at ----, 114 S. CT. at 2639, 129 L. ED.2d at 764, quoting Zant v. Stephens (1983), 462 U.S. 862, 875, 103 S. CT. 2733, 2742, 77 L. ED.2d 235, 248.

In the case at bar, defendant's inability to be rehabilitated was viewed as an aggravating factor in the second phase of the sentencing hearing. Given the discretion that is afforded the trial judge at that stage, we cannot conclude that the judge in the instant case acted arbitrarily by considering defendant's potential for rehabilitation, regardless of whether he considered that potential in other capital cases. (See Tuilaepa, 512 U.S. at ---- n. 21, 114 S. CT. at 2646 n. 21, 129 L. ED.2d at 773 n. 21 (Blackmun, J., dissenting) (arbitrariness challenge to sentencing factor "would require something more than merely pointing to others who committed similar offenses and did not receive the death penalty").) Furthermore, as this court has noted previously, "it has not been our practice to review and compare sentences when they arise from different operative facts." ... We therefore decline to review and compare the cases which defendant submitted with his post-conviction petition.

Finally, we note that defendant is in error in his reliance on Lankford v. Idaho (1991), 500 U.S. 110, 111 S. CT. 1723, 114 L. ED.2d 173, to support the proposition that he was entitled to notice of the trial judge's "rehabilitative potential" standard. In Lankford, the State of Idaho, through a presentencing order, advised the trial court that it was not seeking the death penalty. During the sentencing hearing, the defendant did not present any mitigating evidence but, instead, simply argued the merits of different prison terms. Nevertheless, the trial

court, sua sponte, determined that the defendant should be sentenced to death. On review, the United States Supreme Court concluded that the defendant was denied due process because he did not have "adequate notice of the critical issue that the judge was actually debating." (Lankford, 500 U.S. at 120, 111 S. CT. at 1729, 114 L. ED.2d at 184.) Unlike the situation in Lankford, the defendant in the case at bar had notice that the State was seeking the death penalty. Thus, defendant was aware that his character, which included his rehabilitative potential, could be relied upon by the trial judge in determining his sentence.

In regard to the first contention in this appeal, that the trial court used a vague and arbitrary standard to determine whether the death penalty should be imposed, defendant has failed to establish that a substantial constitutional violation occurred. Therefore, we hold that the circuit court properly dismissed defendant's post-conviction claim that the trial judge used an unconstitutional "rehabilitative potential" standard in sentencing defendant to death.

See 171 Ill.2d at 132-39, 662 N.E.2d at 1292-98, 215 Ill. Dec. at 152-56.

## 3. Analysis

Respondent is correct that the Illinois Supreme Court found that this claim was technically waived. The finding of waiver, based on Petitioner's failure to raise the issue on direct appeal, would clearly be "independent and adequate state law ground," and Petitioner has not attempted to excuse the waiver by showing cause and prejudice or a miscarriage of justice. However, the Illinois Supreme Court considered the claim on the merits as an alternative grounds for its decision, so we will deem it preserved for our review. We note at the outset that the Illinois Supreme Court cited relevant Supreme Court caselaw in its analysis.

On the notice issue, Petitioner's claim fails. First, as noted by the Illinois court, his reliance Lankford v. Idaho, 500 U.S. 110 (1991) is misplaced; that case dealt with a defendant not having notice that he might be sentenced to death, not what particular factors would be considered. Second, as addressed in the previous section, the trial judge did not apply a

"rehabilitation" standard, but instead carefully considered all the statutory factors and all the aggravating/mitigating evidence.

Petitioner over weights certain isolated statements by the trial judge, in particular: "A mitigating factor is not that it is inevitable that the defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again." Petitioner's Memorandum in Support, p. 69 (quoting State Criminal Trial Record at R 2379-80). In the context of the decision as a whole, this comment by the trial judge seems to harken back to the issue in the previous section: that the trial judge took the Petitioner's evidence offered in "mitigation" as simply evidence of his continued dangerousness. *See generally Parke*, 130 F.3d at 784-85. The comments do not indicate that the judge viewed rehabilitation as the relevant legal standard.[11]

Moreover, the trial judge was in no way foreclosed from considering the Petitioner's rehabilitation in his decision. This court notes that the Illinois statute specifically provides that the list of statutory mitigating and aggravating factors is not exclusive. *See* 720 ILCS 5/9-1 (c); *Coleman v. Ryan*, 196 F.3d 793, 798 (7th Cir. 1999). On that score, assessing the likelihood of rehabilitation is equivalent to assessing likelihood of future dangerousness, which passed muster under *Jurek. See also Williams*, 120 S. Ct. at 1515 (the state court "correctly emphasized the

---

[11] Indeed, very little, if any, evidence of rehabilitation was presented for the Petitioner. His trial counsel presented testimony by a female friend, who has maintained a relationship with Petitioner, and the trial judge interpreted that as a claim of rehabilitation. Mr. McLean testified for both Petitioner and codefendant Croft, but only testified about rehabilitation for Croft, and instead focused on Petitioner's remorse. (State Criminal Trial Record at pp. 2189-90, 2289-90.) When asked by the prosecutor about Petitioner's rehabilitation, McLean essentially demurred. (State Criminal Trial Record at 2294.) The prosecutor may have been misled by defense counsel asking McLean if his answers (as to background) were the same for Petitioner as for Croft. (State Criminal Trial Record at pp. 2287.)

strength of the prosecutions evidence supporting the future dangerousness aggravating circumstance"). Lastly, the Petitioner attempts to be, at least indirectly, arguing his rehabilitation (the proposed testimony of Dr. Hillman and Rev. McLean) as a reason that a death sentence is not appropriate, which makes his claim rehabilitation is an inappropriate factor is a bit disingenuous.

## F. Ineffective Assistance–Failure to Submit Medical Evidence in Support of Motion to Suppress

Petitioner argues that defense counsel was ineffective in not requesting, developing, and presenting medical evidence to support his claim that his confession was the product of physical coercion. Petitioner maintains that, if such information had been presented, there is a reasonable probability that his confession would have been suppressed, which would likely have resulted in his acquittal (as the confession was the prosecution's strongest evidence) or, at the very least, spared him the death penalty (as the confession provided gruesome details about the murder).[12] Respondent maintains that the Illinois courts properly evaluated the claim, in particular noting that the evidence as to the timing of the Petitioner's ear injury is ambiguous.

### 1. Legal Standard

To establish ineffective assistance of counsel, a defendant must show that counsel's representation "fell below an objective standard of reasonableness " and that counsel's "deficient performance prejudiced the defense." *Williams*, 120 S. Ct. at 1511(citing *Strickland v.*

---

[12] In support of his claim, Petitioner moved to depose trial counsel and for appointment of a medical expert to examine his ear. This court denied the motion in its memorandum opinion and order of July 10, 1997 ("Order I"). Petitioner's Rule 59 Motion to reconsider this decision was denied by this court on March 11, 1998.

*Washington*, 466 U.S. 668, 687(1984)). Prejudice is defined as a reasonable probability that, but

for counsel's mistake, the result in the case would have been different. *Strickland*, 466 U.S. at

694. "A reasonable probability is a probability sufficient to undermine confidence in the

outcome." *Id.* "The assessment of prejudice should proceed on the assumption that the

decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern

the decision. It should not depend on the idiosyncracies of the particular decision maker, such as

unusual propensities toward harshness or leniency." *Id.* at 695. In reviewing a claim of

ineffective assistance, the court must "indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance." *Id.* at 689. For purposes of

AEDPA, "[i]t is past question that the rule set forth in Strickland qualifies as 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" *Williams,* 120 S. Ct. at

1512.

## 2. State Court Decision

The Illinois Supreme Court rejected this post-conviction claim.

> Defendant contends that he received ineffective assistance of counsel during his suppression hearing because trial counsel failed to present medical records which support his claim that he was physically coerced into giving his statement. During the suppression hearing, defendant argued, inter alia, that he was tired and physically ill during his interrogation; that he was isolated for several hours and was not permitted to make a phone call to contact his family; and that he was impermissibly confronted with a codefendant who made an incriminating statement in his presence. Most importantly, defendant argued that the police officers who interrogated him slapped and punched him and struck him with a telephone book until he gave his confession.
> In response to these arguments, the State presented considerable evidence to establish that defendant's statement was given voluntarily. The State's witnesses, including the police officers and the assistant State's Attorney who took defendant's statement, testified that none of them had struck or punched defendant. The assistant State's Attorney also testified that defendant never complained to

him about being struck by the police officers. Defendant's signed statement indicated that he had been treated fairly and that no threats or promises had been made in exchange for the statement. A photograph of defendant which was taken after he gave his statement, and which was shown to him at the suppression hearing, showed no obvious signs of injury. Significantly, on cross-examination during the hearing, defendant testified that during a prison intake examination which took place out of the presence of the police officers and the assistant State's Attorney on the day after his arrest, he did not complain of any injuries and, in fact, stated that he was in good health. Defendant also testified on cross- examination that his ear "was not bothering" him at the time of the intake examination.

At the suppression hearing, the trial judge found defendant's version of the events surrounding the confession not "worthy of belief." In particular, the judge found it difficult to believe that defendant never mentioned the alleged beatings to the assistant State's Attorney, even though, according to defendant, the assistant State's Attorney entered the interrogation room immediately after the alleged beatings took place in order to record defendant's statement. With respect to defendant's claim that he was denied a phone call, the judge noted that the purpose of the phone call is to provide notice of being in custody to one's family. Since defendant's mother had been present at his arrest and had, in fact, seen him at the police station, notice had been achieved. The judge also found that the police had not confronted defendant with the codefendant on their own initiative but, rather, that defendant himself had requested the confrontation. Based on these findings, the trial court denied defendant's motion to suppress.

Subsequently, in his post-conviction petition, defendant alleged that newly discovered medical records indicated that he had suffered an ear injury and permanent hearing loss at the hands of the police. These medical records consisted of "progress notes" taken during several medical examinations of defendant while he was in prison beginning sometime in 1986 and ending in April 1988. Defendant asserts that trial counsel's failure to present this evidence constitutes a prima facie case of ineffectiveness and, therefore, that the circuit court erred in denying his post-conviction petition. We disagree.

In order to sustain a claim of ineffective assistance of counsel, defendant must show that trial counsel's performance fell below that of a reasonable attorney, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland v. Washington (1984), 466 U.S. 668, 687, 694, 104 S. CT. 2052, 2064, 2068, 80 L. ED.2d 674, 693, 698 (adopted by this court in People v. Albanese (1984), 104 Ill.2d 504, 525-26, 85 Ill.Dec. 441, 473 N.E.2d 1246).) This, defendant has failed to do.

The first medical record in the post-conviction petition, which is dated only "1986," indicates that defendant claimed he was hit in the left ear by the Chicago police during his interrogation on July 17-18, 1986. There is a notation on the record reading: "TM intact--small ant area--possible healed perforation but non

specific" and a note that defendant was to see an ear, nose and throat doctor on "Friday." The second record, dated December 30, 1986, notes that defendant complained of earaches, that he had wax in his left ear, and that he was given medication. The next two records indicate defendant had ear wax and that he complained of having bronchitis. In a fifth record dated March 24, 1987, defendant complained of having an earache, dizziness and headaches. A notation in that record reads "One enmate [sic ] hit him on the L side of the head." In a sixth record dated April 7, 1987, defendant complained of having "testicle edema." In addition, there was a notation reading "Head Trauma 2d fight." The seventh record, dated April 24, 1987, contains a notation reading: "I not [sic ] convinced that any of probable [hearing loss] from alleged beating so I feel we need complete audiogram since defendant feels this will be used in trial." The eighth, and final, record is dated April 11, 1988. It notes that defendant has a hearing loss and that he had been fitted with a hearing aid.

The suppression hearing was held in April 1987. Thus, the record which definitively establishes defendant's hearing loss (the final record dated April 11, 1988) was not available until one year after the hearing. Defendant's trial counsel therefore cannot be faulted for failing to present a medical record which did not exist at the time of the hearing.

Moreover, the remaining medical records are ambiguous in their support for defendant's position. While the first record notes defendant's complaint that the police struck him, the record is dated only "1986." Because the record notes that a follow-up appointment was scheduled, and because the next record is dated December 30, 1986, it is possible to interpret these records as supporting the argument that defendant's first complaint of police mistreatment was not made until several months after the interrogation took place in July 1986, an interpretation which weighs against defendant's allegations of police misconduct. ... In addition, because of the reference to a "2d fight" in the record dated April 7, 1987, it is possible to interpret the medical records as supporting the argument that defendant suffered injuries while in prison, and that those injuries were the source of his hearing loss.

In sum, the medical records are not particularly helpful to defendant; it is impossible to tell from them when defendant's hearing loss occurred or how it occurred, and inferences may be drawn from them which are detrimental to defendant's position. Given these facts, we cannot say that the failure to present the medical records substantially shows that defendant's trial counsel was not rendering "reasonably effective assistance" within the range of "competence demanded of attorneys in criminal cases." Strickland, 466 U.S. at 687-88, 104 S. CT. at 2064, 80 L. ED.2d at 693.

Further, in view of the evidence offered by the State to support its claim of voluntariness, including the detailed confession, the police and assistant State's Attorney's testimony, and, in particular, the lack of any complaints of injury by defendant, we cannot say that these records establish a reasonable probability that

the outcome of the suppression hearing would have been different had they been available. Therefore, we conclude that the circuit court was correct to deny an evidentiary hearing on this matter.

*See* 171 Ill.2d at 140-44, 662 N.E.2d at 1296-98, 215 Ill. Dec. at 156-58.

### 3. Analysis

At the outset, we note that the Illinois court cited *Strickland* and applied the proper standard. We also note that the Illinois court, in its factual review, did make one mistake. As noted in Order I, and conceded by Respondent (Memorandum in Response at p. 15 n. 2), the Illinois Court incorrectly stated that the first treatment note was dated "1986" (rather than 8/19/86). This led them to incorrectly postulate that the injury could have been months after the July 1986 interrogation. Despite this error, Petitioner cannot prevail on his claim.

There is no prejudice if the evidence defense counsel fails to present is so vague or contradictory that it is unlikely to have altered the result in the case. *Spreitzer v. Peters*, 114 F.3d 1435, 1455-56 (7th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998). As noted in Order I, nothing in the medical records (nor the opinion of an expert) could establish with any degree of certainty than Petitioner's ear ailment came as a result from a beating by police officers. On the contrary, given the repeated references to Petitioner's involvement in prison fights, the medical records create a strong inference that the injury was inflicted by a fellow inmate. Add the testimony of the officers and assistant states attorney and the lack of apparent injury at trial, and there is nothing unreasonable about the Illinois court's conclusion.

While one of our brother judges reached the opposite conclusion in a recent case, those facts were far more egregious, and included the officers being implicated in other instances of torture and a statement by the public defender that he had seen evidence of the beating and had

photographed the bruises. *See U.S. ex rel. Maxwell v. Gilmore*, 37 F.Supp.2d 1078 (N.D. Ill. 1999) (J. Shadur).   Lastly, we note that Petitioner's own legal expert, Randall Porter, opined in his report that there was "no hard evidence upon which to attack the confession." (State Post-Conviction Record at p. 306.)

## G. Ineffective Assistance–Failure to Investigate/Present Mitigating Evidence

Lastly, Petitioner claims that he received ineffective assistance of counsel at his sentencing hearing.  Petitioner initially maintained that the defense counsel:(1) failed to have a cohesive strategy for the death penalty hearing; (2) did not begin preparing for the sentencing hearing until after trial; (3) subverted Petitioner's position by pursuing a bogus alibi defense (which undermined Petitioner's mother and grandmother's credibility); (4) utilized an unqualified social worker rather than a psychiatrist; (5) failed to properly prepare the witnesses that he did present; and (6) failed to investigate and present other available mitigating evidence.[13]  Significantly, Petitioner later conceded that trial counsel followed the proper mitigation strategy.  However, he maintains that counsel did not pursue it aggressively enough, in terms of both his investigation of mitigating evidence and presentation to the court.   Respondent argues that the claim is meritless.

## 1. Legal Standard

The Supreme Court has held that the failure to investigate and present substantial mitigating evidence at a death penalty proceeding can constitute ineffective assistance of counsel under the *Strickland* standard.  *Williams*, 120 S. Ct. at 1514-16.  In *Williams*, the errors the

---

[13]Petitioner also argues that a hearing is necessary in order to determine if defense counsel based any of these challenged decisions upon any sort of strategy.

Court found most egregious were: (1) taking less than a week to prepare for the sentencing phase; (2) failing to discover and present evidence of defendant's "nightmarish childhood"; (3) failing to discover and present evidence that defendant was borderline retarded and essentially uneducated; (4) failing to discover and present evidence of defendant's commendable prison disciplinary record; and (5) failing to contact a potentially helpful witness. *Id.* at 1514.[14] *See also Hall*, 106 F.3d at 749 ("defense counsel must make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors"); *Emerson v. Gramley*, 91 F.3d 898, 906-7(7th Cir. 1996), *cert. denied*, 520 U.S. 1122(1997)(ineffective assistance where counsel did not investigate, present, or argue mitigating evidence); *Brewer v. Aiken*, 935 F.2d 850, 857-9 (7th Cir. 1990)(ineffective assistance where counsel presented no evidence of defendant's mental shortcomings and troubled personal history). While *Strickland* requires counsel to conduct a reasonable investigation, "[a] reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998), *cert. denied*, 525 U.S. 1123 (1999). *See also Britz*, 192 F.3d at 1104 (There is no prejudice if further investigation by the attorney would have turned up nothing useful).

---

[14] The defense counsel in *Williams* did little at the sentencing hearing. He presented the brief (and poorly prepared) testimony of defendant's mother and two neighbors (describing him as a "nice boy") and a taped statement of a psychiatrist (recounting defendant's statement that he removed bullets from his gun at early robberies to be sure not to injure anyone). *Williams*, 120 S. Ct. at 1500. His closing argument emphasized defendant's act of confessing, but repeatedly conceded it would be hard show the defendant any mercy given the nature of his crimes. *Id.*

## 2. State Court Decision

On direct appeal, the Illinois Supreme Court completely rejected Petitioner's claim.

In addition to challenging the sentencing judge's assessment of the evidence of defendant's upbringing and family environment, defendant challenges his trial counsel's failure to request the court to appoint a psychiatrist to further evaluate defendant. According to defendant, the information in the psychosocial evaluation prepared by Ms. Dinguss, who was only a social worker with a master's degree in social work and not a psychiatrist or psychologist, was such that his trial counsel should have sought a "full psychiatric workup"; by failing to do so his trial counsel was ineffective and deprived defendant of his sixth amendment right to effective counsel (Strickland v. Washington (1984), 466 U.S. 668, 104 S. CT. 2052, 80 L. ED.2d 674).

As well as being based upon Ms. Dinguss' professional status, this claim is also based upon the statements in Ms. Dinguss' report that, while defendant's relationship with his mother seems to have been "the catalyst which escalated the defendant's anger toward women in general but specifically his mother," "a thorough psychiatric work-up would need to be conducted before any definitive statements could be made in this regard," and Ms. Dinguss found it "impossible to determine precisely with this limited amount of information" the extent of the "psychological trauma" defendant suffered as a result of his upbringing. Defendant's appellate counsel argued this claim of ineffective trial counsel to the trial judge, and also moved post-trial for the appointment of a psychiatrist; as support, counsel presented a letter from a psychiatrist expressing surprise that certain tests and investigations had not been performed before defendant was sentenced. But, in deciding whether trial counsel acted ineffectively in failing to request appointment of a psychiatrist, the only relevant information is that which was available to trial counsel; therefore, we look only at Ms. Dinguss' psychosocial evaluation and testimony, not the subsequent letter of a psychiatrist who was never qualified as an expert.

In Strickland, the Supreme Court stated that in analyzing a claim of ineffective assistance of counsel "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," a presumption that a defendant has to overcome. (Strickland, 466 U.S. at 689, 104 S. CT. at 2065, 80 L. ED.2d at 694.) Further, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (Strickland, 466 U.S. at 688, 104 S. CT. at 2065, 80 L. ED.2d at 694.) In the present case, defendant's trial counsel acted reasonably and effectively in requesting a psychosocial evaluation from the social services department and relying on that report alone, because counsel was merely developing mitigating evidence of defendant's troubled upbringing and family life and their effect on his outlook and attitudes in order to provide at least a partial

explanation for why he had committed these horrendous crimes; this report adequately documented defendant's upbringing and its possible effect on him given the inexactitude of psychiatry. Trial counsel was not attempting to establish that defendant suffered from mental illness or insanity at the time of the offense or the trial, or that defendant had some other legal excuse; and there was no evidence during the guilt-innocence or the sentencing phase of the trial that defendant had shown signs of mental illness or psychiatric instability at any time during his life. Given the parameters of counsel's objective in securing the social services report, it was completely reasonable that counsel did not seek appointment of a psychiatrist in order to "precisely" determine the extent of the "psychological trauma" defendant had suffered while growing up (assuming precision is attainable in the field of psychiatry).

The two cases cited by defendant to support his claim only confirm our conclusion. In Ake v. Oklahoma (1985), 470 U.S. 68, 105 S. CT. 1087, 84 L. ED.2d 53, the Court held that an indigent defendant who shows that his sanity at the time of the offense is likely to be a significant issue at trial has a constitutional right to the assistance of a competent psychiatrist; psychiatric assistance is not constitutionally mandated in every case. Any significance Ake may have to the current issue, whether defense counsel is ineffective for failing to request appointment of a psychiatrist to further develop mitigating evidence of an indigent defendant's troubled upbringing, is clearly unfavorable to defendant's position for he makes no claim that he was mentally ill or insane at any time. Nor is defendant's argument strengthened by this court's decision in People v. Stewart (1984), 101 Ill.2d 470, 79 Ill.Dec. 123, 463 N.E.2d 677. In Stewart, this court acknowledged that there are valid reasons for mental examinations in some cases, such as showing that a defendant acted under extreme mental disturbance, that there are mitigating aspects of a defendant's character or personality, and that a defendant has rehabilitative potential. But while these are "valid reasons to conduct a mental examination, there must be, in the discretion of the judge, some indication that evidence of these mitigating factors and rehabilitative potential might be present" before an examination will be ordered. ... Because the defendant in Stewart had not put his mental condition in issue, and even his own witnesses had not indicated that he had ever had any mental problems, this court held that the trial court did not err in denying his request for a mental examination. As in Stewart, in our case defendant has not claimed or "presented any evidence to demonstrate that his mental condition was abnormal at any time." ...

In Stewart, we also distinguished two other cases relied upon by defendant here; in People v. Gleckler (1980), 82 Ill.2d 145, 44 Ill.Dec. 483, 411 N.E.2d 849, a defense of compulsion was raised, and in People v. Carlson (1980), 79 Ill.2d 564, 38 Ill.Dec. 809, 404 N.E.2d 233, a defense of insanity was raised. In those cases psychiatric evidence had great value because the mental condition of the defendants was directly at issue. The value psychiatric evidence would have had in the present case is comparatively low: defendant never put his mental condition in

issue and merely contends that if there had been an expert psychiatric examination, in addition to the social services evaluation, it might have produced additional mitigating evidence by developing a clearer picture of the effect his upbringing had on his character and his capacity to commit these crimes. We refuse to conclude that defendant's trial counsel was ineffective because he failed to request this additional examination at the sentencing stage of the trial when defendant's mental condition was not at issue and when we can only speculate that such an examination would have developed evidence of any mitigating value beyond that which had already been developed in Ms. Dinguss' report, much less of such significant value as to have affected the judge's sentencing decision.

*See* 142 Ill.2d at 341-5, 568 N.E.2d at 1274-5, 154 Ill. Dec. at 825-6.

The Illinois Supreme Court was no more receptive to this claim in Petitioner's post-conviction appeal.

Defendant contends that trial counsel was ineffective during the sentencing hearing in two ways. First, defendant contends that trial counsel failed to "develop and articulate a cohesive theory of mitigation" prior to sentencing. Second, defendant contends that trial counsel's presentation of mitigation evidence was inadequate. To sustain his claim of ineffective assistance of counsel at this stage, defendant must establish that counsel's actions were objectively deficient and that, absent counsel's errors, there is a reasonable probability that the judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. CT. at 2069, 80 L. ED.2d at 698.

1. Failure to Have Coherent Mitigation Plan

Defendant asserts that in the case at bar, "[t]here was no real chance to avoid a guilty verdict" and that, therefore, trial counsel's failure to develop a "coherent" mitigation plan prior to sentencing meant his performance fell below "the normal standard of care." In support of this assertion, defendant principally relies on two affidavits and a letter which were included with his post-conviction petition. In the first affidavit, Mildred Lincoln, a friend of the family who testified at the sentencing hearing, stated that she did not have contact with trial counsel until after the verdict had been reached. In the second affidavit, Rev. Gordon McLean, a prison chaplain who also testified on defendant's behalf, indicated that he was first approached by trial counsel in the middle of the sentencing hearing. In the letter, which was sent after the verdict had been reached, trial counsel asked defendant's mother if she knew of anyone who could testify on defendant's behalf at his sentencing hearing.

Defendant further maintains that in addition to being inadequately prepared, trial counsel used a strategy during the guilt-innocence phase of trial which prejudiced his sentencing hearing. Specifically, defendant maintains that, without his knowledge, trial counsel requested that his mother and grandmother commit perjury by testifying as to his whereabouts on the night of the murder. Defendant maintains that because of the resulting loss of credibility, trial counsel was precluded from calling his mother and grandmother as important mitigating witnesses at the sentencing hearing.

To analyze defendant's claims, we summarize the evidence which he presented at the sentencing hearing. Three witnesses testified in mitigation. First to testify was Sheri Dinguss, a caseworker for the Cook County social services department. Dinguss had prepared a psycho-social evaluation of defendant based on interviews with defendant and his family. Dinguss was of the opinion that defendant's upbringing was "severely dysfunctional." The nature and extent of this dysfunction was summarized in this court's opinion on direct appeal:

"Defendant, an only child, was raised by his mother, his father having been shot and killed by his mother's uncle before defendant reached his first birthday; this same uncle was shot and killed by his own wife; defendant's grandfather committed suicide; defendant's mother was sexually promiscuous throughout his childhood, a situation he resented, and defendant had been abused by men; his mother had also been molested to some degree by her father and uncle; defendant said his female cousins had molested him; as for defendant's past behavior, he had been involved in gangs, had hit women with his hands and hit the mother of one of his many children with a wrench, and had shot at a woman on a public street." Henderson, 142 Ill.2d at 335-36, 154 Ill.Dec. 785, 568 N.E.2d 1234.

Although there was no evidence that defendant had ever been physically abused, Dinguss believed that he had been emotionally abused by his mother and had suffered some "psychological trauma" from his upbringing. Dinguss also believed that defendant's violent behavior would continue unless he received "long-term intensive psychotherapeutic intervention." Trial counsel also called Mildred Lincoln, a licensed social worker and program director for the homeless at Catholic Charities. Lincoln was a close friend of defendant's family. Lincoln testified that defendant was a very insecure person who needed to be accepted by others and who often did things to get others to like him. She testified that she was confused when she heard that defendant had committed murder because, in her experience, defendant had always shied away from violence. She did not believe that defendant was the kind of person who could have planned the murder and she knew that he was not cruel. In addition, she noted that any lack of remorse by defendant was due to his need to "act like the big man" because of his feelings of insecurity.

The final witness to present mitigating testimony was Rev. Gordon McLean, a chaplain at Cook County jail. Rev. McLean testified that he had spoken with defendant approximately 20 to 25 times, both before, during and after

his trial. During one of their conversations, Rev. McLean asked defendant whether he could sympathize with the feelings of the victim's family. According to Rev. McLean, defendant began to cry and said "that was a terrible thing, I wish I had never had any part of it, but I did, I would give anything that I could possibly imagine or have or do if that young girl could be alive and back with her family, but that can never happen and I'm responsible for that." Rev. McLean testified further that he was surprised at defendant's response and felt he was "being genuine."

In light of the foregoing testimony, we fail to see how the letter and affidavits which defendant has presented establish that trial counsel did not have a "coherent" strategy prior to the sentencing hearing. Trial counsel attempted to show that defendant was a deeply troubled individual whose dysfunctional upbringing made his actions, if not excusable, at least understandable. If trial counsel was unsuccessful in his arguments for leniency, that does not mean that his efforts lacked coherence....

Defendant would liken the case at bar to Brewer v. Aiken (7th Cir.1991), 935 F.2d 850. In Brewer, the defendant's attorney was unaware that, under a new Indiana death penalty statute, the sentencing hearing would immediately follow the guilt phase of the trial. The attorney requested a continuance but was refused, thereby denying the attorney time to investigate information he had just received regarding the defendant's mental history. At the sentencing hearing, the defendant was subjected to "devastating" cross-examination which showed that he had committed perjury. The defendant's attorney never questioned him about his mental history and, indeed, elected not to present any mitigating evidence. (Brewer, 935 F.2d at 851-52.) The reviewing court determined that the defendant had received ineffective assistance of counsel because there was a reasonable probability that, absent his attorney's errors, the outcome of the proceeding might have been different. Brewer, 935 F.2d at 860.

Defendant's reliance on Brewer is misplaced. In the case at bar, trial counsel used the time between the trial and the sentencing hearing to request the psycho-social evaluation prepared by Dinguss and to seek out further mitigating witnesses from defendant's mother. He presented the testimony of Dinguss, Lincoln and Rev. McLean in an attempt to explain defendant's actions, to humanize him and to show his remorse. Indeed, defendant has alleged nothing which would overcome the "strong presumption" that trial counsel's preparation for the sentencing hearing fell "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. CT. at 2065, 80 L. ED.2d at 694.

Nor are we persuaded that trial counsel knowingly requested defendant's mother and grandmother to commit perjury. In affidavits attached to the post-conviction petition, both women state merely that they "understood [trial counsel] to mean" that he wanted them to say defendant was home with his family. Further, while trial counsel was not precluded from calling defendant's mother and grandmother as mitigation witnesses, evidence in the record indicates that he may

have had reason not to. Dinguss testified that she believed defendant's mother had "serious psychological problems" and that she had emotionally abused defendant. According to the affidavit of a family friend, defendant's grandmother "drank regularly and to the point of being drunk." According to her own affidavit, defendant's grandmother at one time suspected that defendant's mother, or some of her boyfriends, had molested defendant. Given this information, trial counsel's decision not to call defendant's mother and grandmother as mitigating witnesses fell within "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" Strickland, 466 U.S. at 689, 104 S. CT. at 2065, 80 L. ED.2d at 695....

2. Inadequate Presentation of Mitigation Evidence

Along with his post-conviction petition, defendant presented a psychological evaluation prepared by Dr. Kip Hillman, a clinical psychologist. Dr. Hillman interviewed defendant and had him undergo a number of psychological tests. Dr. Hillman determined that defendant had an IQ in the range of 75 to 85, that his "performance on abstract tasks was slightly above the level of mild mental retardation," and that he had a "severe character disorder of the borderline type." In addition, Dr. Hillman was of the opinion that defendant was suffering from an extreme mental and emotional disturbance at the time of the crimes. See Ill.Rev.Stat.1985, ch. 38, par. 9-1(c)(2).

Defendant contends that Dr. Hillman's findings were readily available to trial counsel. He contends further that there was no strategic reason for trial counsel not to have discovered or presented this information and that his failure to do so is evidence of his ineffectiveness. In response, the State asserts that this issue was previously considered in this court's opinion on direct appeal and therefore is res judicata.

On direct appeal, defendant argued that his trial counsel was ineffective for failing to request a psychiatric examination when, in her psycho-social evaluation, Dinguss had noted that a "thorough psychiatric workup" was needed to determine precisely the extent of defendant's psychological trauma. This court held that trial counsel acted effectively in relying on the psycho-social evaluation alone because defendant's mental condition was not at issue and because it was speculative to consider what additional mitigating evidence a psychiatric examination might have produced. (Henderson, 142 Ill.2d at 341-45, 154 Ill.Dec. 785, 568 N.E.2d 1234.) However, Dr. Hillman's findings were not part of the record on direct appeal. Because rules of waiver and res judicata are relaxed when the evidence of counsel's deficiency is not part of the trial record ..., we will consider the merits of defendant's claims. ...

In the alternative to its res judicata argument, the State asserts that even if trial counsel's failure to present Dr. Hillman's findings was professionally unreasonable, defendant nevertheless did not suffer any prejudice from that failure. We agree. After carefully reviewing Dr. Hillman's report, we conclude that defendant has failed to demonstrate a reasonable probability that, had the report

been available, the trial judge would have determined that defendant did not deserve the death penalty. First, much of Dr. Hillman's report simply restates details of defendant's troubled upbringing and family background. This information was not only cumulative to Dinguss' testimony but could have been considered aggravating as well. (Henderson, 142 Ill.2d at 336-41, 154 Ill.Dec. 785, 568 N.E.2d 1234.) Similarly, it is not clear that the trial judge would have reacted sympathetically to Dr. Hillman's conclusions that defendant had a low IQ, that he suffered from a severe character disorder and that he had adapted to his environment by "aggressive acting out through fighting and sexual activity."...; Penry v. Lynaugh (1989), 492 U.S. 302, 109 S. CT. 2934, 106 L. ED.2d 256 (characterizing evidence of mental retardation and abuse as having potential to be both mitigating and aggravating).) That these conclusions would have been given little consideration as mitigating evidence is especially likely given the context in which they would have been offered. As the trial judge noted, having a psychologist "throw his opinion into the record" would not have assisted him in his sentencing decision because he had not "heard from any person who [knew defendant] intimately, nor from any person who was engaged with part of his life, including the young lady who was never married to him or was a girlfriend by whom he had a child who testified here that no one ever said he exhibited any psychiatric instability or that he in any way exhibited any type of conduct or behavior which lead them to believe that he was in need of treatment."

Nor is it reasonably likely, based on Dr. Hillman's findings, that the trial judge would have concluded that defendant was under the influence of an extreme emotional disturbance at the time of the murder, and that his mind was at " 'such a fragile point as to leave him with little to no emotional control.' " ... Prior to the murder, defendant helped orchestrate a group sexual assault of the victim which took place over an extended period of time. After the assault, according to the statement which he made to the police, defendant was responsible for persuading his codefendants that they should kill the victim. Defendant helped place the victim in the trunk of his car. With the victim in his trunk he stopped and gave a jump start to a friend's car. He then intentionally evaded several of his codefendants who were following him in a second car so they would not be present for the murder. When defendant opened the trunk of his car, again according to his statement, the victim stated that she could "explain." In response, defendant helped stab the victim over 40 times. When the stabbings failed to kill the victim, the defendant stated that he would run her over and that he would, in his words, "take responsibility for the car." He then drove over the victim three times until she was dead. Based on these facts the trial judge determined that defendant was a "cold," "calculating" and "uncaring individual" who had taken the victim's life "with planning." We consider it highly unlikely that Dr. Hillman's report would have changed this determination. ...

Defendant also contends that trial counsel was ineffective for failing to present high school records which purportedly establish that defendant was

learning disabled. These school records, which were part of the post-conviction petition, consist of various conference reports, teacher evaluations, progress reports, grades and other information. The records plainly show that defendant was placed in special education classes. Several of the forms indicate that defendant was to be placed in the "LD [learning disabled] EH [educationally handicapped] program," or that he was to take "EH-LD classes [and] mainstream when appropriate." In addition, the school records show that the majority of defendant's grades were quite poor.

But perhaps the clearest indication of the school's psychological evaluation of defendant can be found on a multipurpose conference report form which appears several times among the school records. A section of this form is titled "Exceptional Characteristics." In this section is a listing of various descriptive phrases, or characteristics, including "educationally handicapped" and "learning disabled." Next to each of the listed characteristics are two empty boxes, respectively under column headings labeled "primary" and "secondary." According to instructions included among the records, the "Exceptional Characteristics" list is included on the form to satisfy the requirements of "P.L. 94-142," an apparent reference to the Education for All Handicapped Children Act of 1975 ( 20 U.S.C. SS 1232, 1401, 1405, 1406, 1411 et seq., 1453 (1988)). The instructions note that "[t]he information under 'Exceptional Characteristics: Primary' must correspond with where the student appeared/will appear on the 94-142 Child Count."

All of defendant's completed conference report forms have the characteristic "educationally handicapped" checked in the "primary" box. Only one of the forms has the characteristic "learning disabled" checked, and that is checked in the "secondary" box. The terms "educationally handicapped" and "learning disabled" are not defined on the forms, nor is the distinction between a "primary" and "secondary" characteristic explained. Thus, we would be left to speculate as to the extent, if any, of defendant's learning disability. More fundamentally, we would also be left to speculate as to the relationship between a learning disability and general mental impairment. Because of the absence of any conclusive psychological information on the forms, we fail to see how trial counsel's decision not to investigate or present these records substantially shows his ineffectiveness. Moreover, even if one accepts that defendant is learning disabled, defendant has failed to demonstrate how that fact creates a reasonable probability that the judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S. CT. at 2069, 80 L. ED.2d at 698.

In addition, we note that there is information in the school records that is potentially aggravating to defendant. Defendant's teachers made written comments on many of the different reports. Some of these comments were positive, noting, for example, that defendant got along well with others. However, most of the comments were critical, including such notes as: "does not seem to be concerned

about his low level of achievement"; "talks out of turn"; "truant"; and "lazy." Trial counsel cannot be faulted for failing to present evidence which contained some mitigating evidence, but which also mentioned aggravating information, including defendant's lack of interest in education....

Defendant also contends that trial counsel was ineffective because he understated the available mitigating evidence. In support of this contention, defendant points to several affidavits from family members, teachers and friends which were part of his post-conviction petition. The affidavits show that these witnesses would have testified that defendant was nice, that he liked to help others, and that he had a highly troubled upbringing. Defendant contends that if trial counsel had presented these additional witnesses there is a reasonable probability that he would not have been sentenced to death. We disagree.

We have carefully read the affidavits and have concluded that the bulk of the proffered testimony was, in fact, presented at the sentencing hearing through the testimony of the mitigation witnesses. Through the testimony of Lincoln the trial judge was informed of defendant's need to be accepted and his desire to help others. Through the testimony of Dinguss, the trial judge heard extensive information regarding defendant's dysfunctional upbringing. Additional testimony offered on these points would have been cumulative. Trial counsel's performance cannot be considered deficient because of a failure to present cumulative evidence.
...

Furthermore, some of the affiants' testimony was not helpful to defendant. James Marshall, a friend of the family, stated that he gave defendant a job at a car dealership. He noted that defendant "was very reliable," that "he worked hard" and that "he got along fine with the other workers." However, other evidence in the record establishes that defendant was employed by the car dealership for only one week. Given this information, we must conclude that Marshall's testimony would have received little weight, and, indeed, might have harmed defendant's credibility. Linda McGee, another friend of the family, stated in her affidavit that defendant would help her out by calling her boyfriend, who was married at the time to another woman. Clearly, aiding someone in this manner is not the type of evidence which trial counsel can be faulted for failing to present.

In short, defendant has failed to demonstrate that trial counsel was ineffective for failing to have additional witnesses testify on his behalf. Further, in view of the aggravating evidence put forth by the State, including the brutal nature of the crime and defendant's violent tendencies, defendant has failed to establish a reasonable probability that the trial judge would have imposed a different sentence had these witnesses testified.

*See* 171 Ill.2d at 144-56, 662 N.E.2d at 1298-1303, 215 Ill. Dec. at 158-63.

### 3. Analysis

We note that the Illinois Supreme Court cited *Strickland* and applied the appropriate legal standard. As before, the question comes down to whether the application was reasonable.

Significantly, this case differs from *Brewer*, *Emerson*, and *Williams*. In those cases defense counsel did essentially nothing(or made matters worse).[15] Nor is this a case like *Hall*, in which the disregarded mitigating evidence included several selfless acts of heroism. Here, defense counsel, as conceded by Petitioner, followed the a reasonable mitigation strategy of emphasizing Petitioner's remorse and attempting to humanize him by presenting information about his troubled family life. The dispute centers on whether defense counsel did enough in pursuing the mitigation strategy.

We will not tarry long on the first prong of *Strickland*. Petitioner makes much of the fact defense counsel did not begin preparing for sentencing until after the trial. While the *Williams* Court indicated that a week was not adequate time to prepare for a death penalty hearing, defense counsel in this case had (presuming Petitioner's view is correct) well over a month to prepare. We are reluctant to conclude, as a matter of law, that a defense attorney can never adequately prepare for a sentencing hearing in a month.[16] Nonetheless, Petitioner has made at least a colorable showing that defense counsel made various errors, including the failure to interview and prepare witnesses. ( *See* Lincoln and McLean Affidavits, Post-Conviction Record at pp. 288-89,

---

[15] Although the failure to present any mitigating evidence is not necessarily ineffective assistance. *See, e.g., Jones*, 76 F.3d at 846.

[16] Although it would not be unprecedented for a defense attorney to squander even an adequate time period. *See, e.g., Hall*, 106 F.3d at 746 ("Sixth weeks elapsed between the conviction and the sentencing hearing–six weeks in which Hall's lawyers did practically nothing to advance the case.")

292.).  *See generally Washington v. Smith*, No. 99-2383, slip op. (7th Cir. July 6, 2000).  Most of Petitioner's claimed errors, however, could only fairly assessed as "errors" after a hearing in which defense counsel had the opportunity to testify as to whether the claimed "errors" were actually reasonable strategic choices under the circumstances.  No such hearing is necessary in this case, as Petitioner cannot show prejudice from any of the claimed errors.

First, as to defense counsel's failure to consult a psychiatrist, we note that a troubled family life and an abnormal psychological profile are not sure-fire winners as mitigating factors. The impact of evidence regarding mental/psychological shortcomings can be far from decisively positive for a defendant.  *See Holman v. Gilmore*, 126 F.3d 876, 883-84 (7th Cir. 1997), *cert. denied*, 522 U.S. 1150 (1998).  "Men who repeatedly assault women, finally murdering one, are unlikely to have a normal psychological profile," and "[t]hey are unlikely to be the highly intelligent products of a warm and loving home." *Thomas*, 144 F.3d at 517.  Even the presentation of such "mitigating" characteristics as a below average IQ, neurotic personality, "antisocial personality disorder", and "characterological disorder of the asocial type" may be "exceedingly unlikely" to have prevented the imposition of a death sentence given the brutality of the crime. *Lear v. Cowan,* No. 99-2564, slip op. at 6 (7th Cir. July 13, 2000) (such diagnoses "strikes us as fancy language for being a murderer").  In addition, it is not ineffective assistance, per se, not to seek a psychological review if there is no indication of mental illness.  *See generally Tenner,* 184 F.3d at 615-16; *Jones*, 76 F.3d at 841 (The Sixth Amendment does not require the defense attorney to explore his client's mental capacity in every case). *See also Lear*, 207 F.3d at 888 (There is no per se entitlement under the Eighth Amendment to the services of a "mitigation specialist").  Moreover,  a good portion of Dr. Hillman's report is merely cumulative to Ms.

Dinguss's testimony about Petitioner's troubled family life. *See* Hillman Report, State Post-Conviction Record at 169-175.

As to Hillman's most significant conclusion, that the Petitioner was suffering from an "extreme mental and emotional disturbance" during the commission of the crime (State Post-Conviction Record at p. 175), it is not as helpful as it would appear to be. While that would be a statutory mitigating factor in Illinois, any attempt to establish that the Petitioner was suffering such an extreme emotional disturbance would be doomed to failure. Over the course of the attack, Petitioner made several coldly calculated decisions, which included:(1) the decision to kill the victim/witness to avoid prosecution for the gang rape (Confession, Supplemental Record on Direct Appeal at pp. 36-7); (2) the decision to help jump start a friend's car while contemplating victim's fate (*Id.* at 37); (3) the decision to jump start a friend's car with the victim in his trunk en route to the kill site (*Id.* at 39); (4) the decision to evade a group of accomplices to the rape that were following in a second car (*Id.*); (5) the decision to wait for police activity to cool en route to the kill site (*Id.* at 40); (6) the decision to make sure the victim was "finished off" (*Id.* at 41);and (7) the decision to overrule codefendant Croft as to who would administer the gruesome *coup de grace* with the car (*Id.* at 42). Given the duration of the attack, Petitioner's control of other participants, Petitioner's coldly rational decision to eliminate the victim/witness, and Petitioner's nonchalant actions in helping a friend with car trouble while the victim was in Petitioner's trunk, any claim that Petitioner was out of control due to an "emotional disturbance" is completely untenable. There is no prejudice in failing to present a psychological expert on the issue of extreme emotional disturbance if the facts of the crime show such a defense could not be established. *See Foster v. Schomig*, No. 99-1398, slip op at *10 (7th Cir. May 31, 2000). *See*

74

*also Ashford*, 167 F.3d at 1135 (counsel's failure to present evidence that defendant used drugs shortly before offense not prejudicial, given that the cold, calculated nature of offense provides no support for inference that defendant was impaired). That Petitioner's counsel did not present this futile defense does not show ineffective assistance.

The result regarding the other proposed evidence is the same. That defense counsel did not present every conceivable family/character witness does not automatically render his performance ineffective.[17] In *Strickland* itself the failure to present additional character witnesses was not deemed ineffective assistance, nor was the state court's failure to hold an evidentiary hearing on the issue deemed error. *See* 466 U.S. at 698-700. Character witnesses may be far from enough to change a sentencing decision. *See generally Milone v. Camp*, 22 F.3d 693, 704 (7th Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995) ("twenty-five people testifying to Milone's good character would not be likely to alter the sentence pronounced by a judge who had just found Milone guilty at a bench trial of a particularly heinous and gruesome murder").

An attorney may reasonably decide not to present character/family witnesses, if their testimony is unlikely to help (or may even harm) the defendant's case. *See, e.g., Burger v. Kemp*, 483 U.S. 776, 793-95 (1987). The family/friend witness affidavits seem to stress one or both of the following points:(1) that the Petitioner that they knew was a nice person; and/or (2) that Petitioner had a difficult family life. In light of the brutality of the crime, the former was unlikely to influence the sentencer. *See Milone*. As to the latter, it is cumulative to the testimony actually presented at the sentencing hearing. Further, some of the proposed witnesses could have been

---

[17] Even though he chose not to call them to the stand, defense counsel did acknowledge that 15 friends and relatives were at the sentencing hearing offering their support to Petitioner.

subject to embarrassing cross examination, including the Petitioner's mother (Petitioner's primary

abuser), grandmother (who also figured negatively in his life), his "employer" (whose assessment

looks foolish given the brief period of employment), and a friend (who Petitioner assisted in an

adulterous relationship). *See generally Brewer*, 935 F.2d at 859 (failure to present defendant's

employment record not ineffective assistance). Lastly, the neither the school records nor prison

records contained information likely to make any real difference in the sentencer's decision.

Judge Easterbrook could have been writing about this case when he wrote:"[Petitioner's] current

lawyers assume that a good lawyer must be able to find some resource for every accused, no

matter what the evidence shows. Not so. Some crimes are so heinous, and so well documented,

that there is little to be done for the defendant." *Tenner*, 184 F.3d at 617.

In sum, there is nothing unreasonable in the Illinois Supreme Court's application of

*Strickland* principles to this issue.

## CONCLUSION

For the foregoing reasons, the court orders that a writ of habeas corpus will be granted

unless the State of Illinois holds an appropriate new hearing on Petitioner's *Batson* claim within

120 days of the date of this order. If the *Batson* hearing is not held within that time limit, a writ

of habeas corpus will be granted unless the Petitioner is retried within 240 days of the date of this

order. This order will be automatically stayed during the pendency of any appeal.

ENTER:

John A. Nordberg
Senior United States District Judge

Dated: *September 29, 2000*

76